**CONSOLIDATION COAL COMPANY, Petitioner,**

v.

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION, et al., Respondents,**

**Coal Employment Project, United Mine Workers of America, Intervenors.**

No. 86–1403.

United States Court of Appeals, District of Columbia Circuit.

Argued March 6, 1987.

Decided July 24, 1987.

Robert M. Vukas, with whom Richard J. Klein, was on brief, for petitioner.

John Longstreth, with whom Kathryn P. Broderick, Edward M. Green, Henry Chajet and Michael F. Duffy, Washington, D.C., were on brief, for amicus curiae, American Min. Congress.

Ann Rosenthal, Counsel, Appellate Litigation, Dept. of Labor, with whom Linda Leasure, Atty., Dept. of Labor, Arlington, Va., was on brief, for respondent.

Dennis Clark, with whom Michael H. Holland and Mary Lu Jordan, Washington, D.C., were on brief, for intervenor, United Mine Workers of America.

J. Davitt McAteer, Betty Jean Hall and John F. Colwell, Washington, D.C., were on brief, for intervenor, Coal Employment Project.

Before WALD, Chief Judge, and EDWARDS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

Concurring opinion filed by Circuit Judge HARRY T. EDWARDS.

Dissenting opinion filed by Circuit Judge D.H. GINSBURG.

WALD, Chief Judge:

Petitioner Consolidation Coal Company ("Consol") was issued a citation under § 104(a) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 814(a). The citation alleged that Consol had violated 30 C.F.R. § 70.100, which sets forth respirable dust standards for coal mines, and that the violation was "of such nature as could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard." 30 U.S.C. § 814(d)(1), (e).[1] Consol conceded that it had violated the standard, but con-

tested the citation on the ground that the violation should not have been designated as significant and substantial. Following an evidentiary hearing, an Administrative Law Judge ("ALJ") affirmed the contested citation and upheld the designation of the violation as significant and substantial. *Consolidation Coal Co.*, 5 F.M.S.H.R.C. 378 (1983). The ALJ's decision was affirmed by the Federal Mine Safety and Health Review Commission ("Commission"), which concluded that "when the Secretary proves that a violation of 30 C.F.R. § 70.100(a) ... has occurred, a presumption that the violation is a significant and substantial violation is appropriate." *Consolidation Coal Co.*, 8 F.M.S.H.R.C. 890, 899 (1986). Consol then filed a petition for review in this court. Consol argues that the presumption that any violation of the respirable dust standard is significant and substantial conflicts with the statutory enforcement scheme and lacks a rational basis. In addition, Consol contends that the sampling techniques used to measure concentrations of respirable dust are so inaccurate that they cannot serve as the basis of a determination that Consol's violation of the respirable dust standard was significant and substantial. We conclude that the Commission properly affirmed the designation of Consol's violation of the respirable dust standard as significant and substantial.

I. BACKGROUND

A. *Statutory and Regulatory Framework*

Until 1977, coal mine health and safety were regulated under the Federal Coal Mine Health and Safety Act of 1969 ("Coal Act"), 30 U.S.C. § 801 *et seq.* The Federal Mine Safety and Health Act of 1977 ("Mine Act") was created by the enactment of the Federal Mine Safety and Health Amendments Act, Pub. L. No. 95–164, 91 Stat. 1290, which amended the Coal Act and placed all forms of mining under a single regulatory scheme.

1. The phrase "significant and substantial" will be substituted for this statutory language throughout this opinion.

The Mine Act authorizes the Secretary of Labor ("Secretary") to promulgate mandatory health and safety standards, 30 U.S.C. § 811, and requires frequent inspections of mines to determine whether those standards have been complied with. 30 U.S.C. § 813. The enforcement provisions of the Mine Act are set forth in § 104 of the Act, 30 U.S.C. § 814. Section 104(a) provides that an inspector who determines that a mine operator has violated a mandatory standard "shall, with reasonable promptness, issue a citation to the operator." 30 U.S.C. § 814(a). The citation must "fix a reasonable time for the abatement of the violation." *Id.* For each violation, the mine operator is assessed a civil penalty of not more than $10,000 by the Secretary. 30 U.S.C. § 820(a). In addition, if a violation is not abated within the allotted time, the Secretary must issue a withdrawal order requiring the removal of all miners from the area of the mine affected by the violation until the violation is abated. 30 U.S.C. § 814(b).

Sections 104(d) and 104(e) provide for more severe sanctions to be applied when an operator commits a series of violations which meet certain criteria. Section 104(d) is triggered when an inspector finds that a violation is significant and substantial and "caused by an unwarrantable failure" of the mine operator to comply with a mandatory health or safety standard. 30 U.S.C. § 814(d)(1).[2] A 90–day probationary period begins when a citation containing these findings is issued. If another unwarrantable violation occurs during the probationary period, the Secretary is required to issue an immediate withdrawal order, without first giving the mine operator an opportunity to abate the violation. *Id.* Once a withdrawal order has been issued under § 104(d)(1), additional withdrawal orders must be issued for subsequent unwarrantable violations until an inspection of the mine discloses no unwarrantable violations. 30 U.S.C. § 814(d)(2).

Section 104(e) imposes a similar 90–day probationary period, beginning when the Secretary notifies an operator of the existence of a pattern of significant and substantial violations. An immediate withdrawal order must be issued if another significant and substantial violation is found within the probationary period. 30 U.S.C. § 814(e)(1). After such a withdrawal order has been issued, the pattern can be terminated only by an inspection of the entire mine that reveals no significant and substantial violations. 30 U.S.C. § 814(e)(3).

The mandatory standard violated by Consol is set forth in 30 C.F.R. § 70.100(a), which requires mine operators to "continuously maintain the average concentration of respirable dust in the mine atmosphere during each shift to which each miner in the active workings of each mine is exposed at or below 2.0 milligrams of respirable dust per cubic meter [mg/m$^3$] of air." This standard adopts the statutory requirement of 30 U.S.C. § 842(b)(2), which was enacted in 1969 as part of the Coal Act. One of the primary purposes of the Coal Act was the prevention of respiratory diseases, including coal workers' pneumoconiosis ("black lung disease"), chronic bronchitis, and emphysema caused by exposure to respirable coal mine dust. *See* 30 U.S.C. § 841(b).

Coal mine operators are required to take "accurate samples of the amount of respirable dust in the mine atmosphere to which each miner ... is exposed" and to submit those samples to the Secretary for analysis. 30 U.S.C. § 842(a). In 1980, the Mine Safety and Health Administration ("MSHA") promulgated revised regulations governing dust sampling procedures. *See* 45 Fed. Reg. 23,990 (1980). The regulations require mine operators to collect and submit two types of respirable dust samples. *Id.*

---

**2.** The Commission has defined "unwarrantable failure" as "a showing that the violative condition or practice was not corrected or remedied, prior to issuance of a citation or order, because of indifference, willful intent, or a serious lack of reasonable care." *United States Steel Corp.,* 6 F.M.S.H.R.C. 1423, 1437 (1984); *see also* Joint Appendix ("J.A.") at 254a–255a (testimony of Chief of Division of Health of Mine Safety and Health Administration) (unwarrantable failure finding requires showing of negligence).

at 23,990–91; 30 C.F.R. §§ 70.207, 70.208. The first type, "designated area samples," are taken at particular locations in the mine at which dust is likely to be generated. This case involved the second type, "designated occupation samples," which are taken for each "mechanized mining unit" in the mine.[3] One occupation on each mechanized mining unit is designated as most hazardous in terms of exposure to respirable dust. The samples are collected by having the miner who performs the designated occupation wear the sampling device or by placing the sampling device near that miner's normal work position. The regulations require mine operators to collect and submit five samples during each bimonthly period for each mechanized mining unit; the dust concentrations of the five samples are averaged to determine if the respirable dust standard has been violated.

B. *Prior Proceedings In This Case*

Pursuant to the designated occupation sampling regulations, Consol collected five respirable dust samples in January, 1982 for the continuous miner occupation in section 026–0 of the Blacksville No. 1 Mine in Monongalia County, West Virginia.[4] MSHA's analysis of the samples revealed respirable dust concentrations of 8.1, 6.3, 5.1, 0.7, and 0.4 mg/m$^3$.[5] Thus, the average concentration for the five samples was 4.1 mg/m$^3$.

Based on these test results, on February 16, 1982, an MSHA inspector issued a citation under § 104(a) of the Mine Act, 30 U.S.C. § 814(a), alleging that Consol had violated the respirable dust standard, 30 C.F.R. § 70.100(a), and that the violation was significant and substantial. Consol was able to abate the violation without making any changes in ventilation or mining procedures. According to Consol, "[t]he only act necessary to achieve abatement was to 'babysit' the sampling device

to ensure its reliable functioning." Brief of Consolidation Coal Company at 8–9. The citation was terminated on March 5, after Consol submitted five samples which showed respirable dust concentrations of 0.2, 0.2, 0.5, 0.7, and 0.8 mg/m$^3$.

The designation of Consol's violation as significant and substantial was consistent with MSHA policy guidelines adopted in response to the Commission's decision in *Cement Division, National Gypsum Co.,* 3 F.M.S.H.R.C. 822 (1981). The Commission held in *National Gypsum,* a case involving violations of mandatory safety standards, that a violation is properly designated as significant and substantial "if, based upon the particular facts surrounding that violation, there exists a reasonable likelihood that the hazard contributed to will result in an injury or illness of a reasonably serious nature." *Id.* at 825. In a subsequent decision, *Mathies Coal Co.,* the Commission expanded on its decision in *National Gypsum,* holding that

to establish that a violation of a mandatory safety standard is significant and substantial under *National Gypsum,* the Secretary of Labor must prove: (1) the underlying violation of a mandatory safety standard; (2) a discrete safety hazard—that is, a measure of danger to safety—contributed to by the violation; (3) a reasonable likelihood that the hazard contributed to will result in an injury; and (4) a reasonable likelihood that the injury in question will be of a reasonably serious nature.

6 F.M.S.H.R.C. 1, 3–4 (1984) (footnote omitted). The Commission emphasized that *Mathies* involved a violation of a mandatory safety standard and noted that the question of the application of *National Gypsum* to a mandatory health standard was pending before the Commission in this case. *Id.* at 3 n. 4.

3. A mechanized mining unit is defined as "a unit of mining equipment that a production crew utilizes for the extraction of material." 45 Fed.Reg. at 23,991.

4. Section 026–0 is a mechanized mining unit—specifically, a continuous mining machine.

5. Consol had noted on two of the samples "please check for contamination, rock dust, oversized particles." MSHA did not microscopically examine the samples, however, because MSHA's policy is to conduct a microscopic examination only of those samples which test at 8.6 milligrams per cubic meter or higher.

After the Commission's decision in *National Gypsum*, the MSHA adopted enforcement guidelines implementing that decision. *See* Guidelines for Determining Whether a Violation is "Significant and Substantial," Addendum C to Brief for the Secretary of Labor. With respect to violations of mandatory health standards, the guidelines stated:

MSHA is currently reviewing the application of these guidelines to violations involving mandatory health standards. Pending completion of this review, violations involving mandatory health standards which limit exposure to or require protection from harmful airborne contaminants, toxic substances or harmful physical agents should be designated as "significant and substantial."

*Id.* at 3.

Consol contested the citation, admitting that it had violated the respirable dust standard, but arguing that the violation should not have been designated as significant and substantial. Following an evidentiary hearing, a Commission ALJ upheld the designation of the violation as significant and substantial. *Consolidation Coal Co.*, 5 F.M.S.H.R.C. 378 (1983). The ALJ found, based on the medical evidence presented, that "the exposure covered by the dust samples which resulted in the citation herein *in itself* would neither cause nor significantly contribute to chronic bronchitis ... or coal workers pneumoconiosis." *Id.* at 389 (emphasis in original). Nevertheless, the ALJ referred to each incident of exposure to excessive levels of respirable dust as "a drop in the bucket" and concluded that "every drop in the bucket, every two month sampling period where excessive dust is present, significantly and substantially contributes to a health hazard—the hazard of contracting chronic bronchitis or coal workers' pneumoconiosis." *Id.* at 390. The ALJ found that there was no evidence that the violation was caused by negligence on the part of Consol. He imposed a penalty of $150. *Id.*

The Commission affirmed the ALJ's decision, holding that "some departure" from the *National Gypsum* standard was justi-fied in this case "because of fundamental differences between a typical safety hazard and the respirable dust exposure-related health hazard at issue." *Consolidation Coal Co.*, 6 F.M.S.H.R.C. 890, 895 (1986). Adapting the *Mathies Coal Co.* formula to the context of a health standard violation, the Commission set out the elements necessary for a finding that such a violation is significant and substantial:

(1) the underlying violation of a mandatory health standard; (2) a discrete health hazard—a measure of danger to health—contributed to by the violation; (3) a reasonable likelihood that the health hazard contributed to will result in an illness; and (4) a reasonable likelihood that the illness in question will be of a reasonably serious nature.

*Id.* at 897. In applying this test to the violation at issue, the Commission had no trouble in determining that the first, second, and fourth elements were met, but it acknowledged that "[t]he third element ... presents a more difficult conceptual issue." *Id.* at 898. The Commission recognized that "proof of a single incident of overexposure does not, in and of itself, conclusively establish a reasonable likelihood that respira[tory] disease *will* result." *Id.* (emphasis in original). It also noted, however, that the harmful effects of overexposure to respirable dust are cumulative and do not produce any symptoms until serious harm has already occurred, so that it is impossible to predict "the precise point at which the development of chronic bronchitis or pneumoconiosis will occur or is reasonably likely to occur." *Id.* The Commission considered the text and legislative history of the Mine Act and concluded that the Act embodied "an unambiguous legislative declaration in favor of preventing any disability from pneumoconiosis or any other occupation-related disease." *Id.* at 897. Given the insidiousness and unpredictability of the onset of respiratory disease, coupled with the fact that prevention of such disease was one of the fundamental purposes of the Mine Act, the Commission concluded that once a violation of the respirable dust standard has been proven, "a presumption arises that the third element of the signifi-

cant and substantial test—a reasonable likelihood that the health hazard contributed to will result in an illness—has been established." *Id.* at 899. The Commission went on to hold that, because the four elements of the test would be met in any case in which a violation of the respirable dust standard was shown to exist, "rather than requiring the Secretary to prove anew all four elements in each case, we hold that when the Secretary proves that a violation of 30 C.F.R. § 70.100(a) ... has occurred, a presumption that the violation is a significant and substantial violation is appropriate." *Id.* A mine operator could rebut this presumption, the Commission stated, by showing that miners were not actually exposed to the excessive dust concentration— through the use of protective equipment, for example.

The Commission also rejected Consol's argument that MSHA's dust sampling procedures were not sufficiently accurate to support a finding that a violation of the respirable dust standard was significant and substantial. The Commission noted that "all sampling methods fall short of perfection and are designed to provide best estimates of actual conditions." *Id.* at 900. It concluded that the sampling procedures adopted by MSHA, if properly applied by the mine operator, would produce results which were "reasonably representative of the mine atmosphere." *Id.* at 901. Further, Consol had failed to present any persuasive evidence that the accuracy of the results was compromised in its case. *Id.* at 902.

## II. ANALYSIS

### A. *Ripeness*

Before turning to the merits of this appeal, we consider the threshold issue of whether the Commission's designation of Consol's violation as significant and substantial is ripe for review. We do so not at the request of either the Secretary or the petitioner, but because our dissenting colleague has sua sponte raised the issue. At

first glance, it is hard to fathom why the question of ripeness arises in this case at all. It is undisputed that the challenged policy, under which the Commission presumes that the statutory "significant and substantial" designation is appropriate for any violation of the respirable dust standard, has been squarely applied to Consol. There was nothing indefinite or conditional about the Commission's finding that Consol's violation was significant and substantial. Indeed, we have difficulty in seeing this as an appropriate case for a ripeness analysis at all, but feel compelled to go through the exercise because of the dissent's extensive argument that we should not reach the merits of Consol's challenge at all.

The ripeness inquiry requires us to consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). In applying the *Abbott Laboratories* test, the court must weigh the "interests of the challenging parties in obtaining a prompt resolution of their dispute" against "any institutional interests that either the court or the agency may have for postponing review." *State Farm Mutual Automobile Insurance Co. v. Dole,* 802 F.2d 474, 479 (D.C.Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987). Institutional interests in the deferral of review may be outweighed if postponing review will impose a hardship on those affected by the agency's action which is "immediate, direct, and significant." *State Farm,* 802 F.2d at 480; *see also Ciba-Geigy Corp. v. United States E.P.A.,* 801 F.2d 430, 439 (D.C.Cir.1986).

The dissent does not appear to dispute that Consol has demonstrated sufficient injury resulting from the designation of its violation as significant and substantial to satisfy the Article III "case or controversy" requirement.[6] In § 104 of the Mine

---

**6.** We have previously noted that "[r]ipeness law overlaps at its borders with Article III requirements of case or controversy." *Eagle-Picher In-*

*dustries v. United States E.P.A.,* 759 F.2d 905, 915 (D.C.Cir.1985); *see also Action Alliance of*

Act, 30 U.S.C. § 814, Congress established a detailed scheme for enforcement of mine health and safety standards promulgated by the Secretary of Labor. That statutory scheme specifically provided for findings by the Secretary that certain violations of health and safety standards were significant and substantial. 30 U.S.C. § 814(d), (e). Pursuant to that statutory authorization, the Secretary designates violations as significant and substantial in citations issued under § 104(a). *Consolidation Coal Co.*, 6 F.M.S.H.R.C. 189, 191–92 (1984). Designation of violations as significant and substantial at the initial § 104(a) citation stage is necessary if the more severe sanctions available under § 104(e) are ever to be applied. If there were no procedure for initially labeling individual violations as significant and substantial, the Secretary could never find that a "pattern" of such violations existed, and § 104(e) sanctions could not be brought into play.

■ The agency action challenged here was the application of the statutory "significant and substantial" designation to a conceded violation of the respirable dust standard. Consol was directly injured by the designation of its violation as significant and substantial, over and above the injury which resulted from its having been deemed a violator. That designation not only increased the amount of the civil penalty assessed against Consol for this violation, it also became a part of Consol's permanent record, thereby exposing Consol to more severe sanctions for later violations. Under the law of this circuit, it is quite clear that the application of the significant and substantial designation to Consol's violation supplied the " 'modicum of injury' necessary to support jurisdiction." *Meredith Corp. v. FCC*, 809 F.2d 863, 868 (D.C. Cir.1987) (quoting *Straus Communications, Inc. v. FCC*, 530 F.2d 1001, 1006 (D.C.Cir.1976)).

Section 110 of the Mine Act, 30 U.S.C. § 820, provides that a civil penalty of not more than $10,000 shall be assessed for each violation of a mandatory health or safety standard. Congress has directed the Commission to consider several factors in assessing such penalties, one of which is "the gravity of the violation." 30 U.S.C. § 820(i); *see also* 30 C.F.R. § 100.3(e). In this case, the Secretary simultaneously determined that Consol's violation was serious enough to be designated as significant and substantial and recommended a penalty of $140.[7] Before the Commission, Consol argued that its violation of the respirable dust standard was not properly designated as significant and substantial. It seems highly implausible that the Commission could have agreed with Consol that its violation should not have been labeled as significant and substantial, and nevertheless have determined that the penalty proposed by the Secretary, based on the gravity of the offense, was an appropriate one.

The dissent points out that the Secretary has stated, in the context of defending the use of the significant and substantial designation for violations of mandatory health standards, that "[e]ven if it were to be judicially determined that the statutory significant and substantial finding requires a higher degree of gravity than that currently utilized, that finding would *not necessarily* have any effect on MSHA's gravity evaluation for civil penalty purposes." Brief of the Secretary of Labor at 32 n. 16 (emphasis added). The way in which the Secretary has actually exercised his discretion, however, causes us to be skeptical about that statement as supporting the dissent's claim that Consol suffered no injury with respect to the penalty assessed as a result of the significant and substantial finding. MSHA regulations set up a special category of civil penalty—the "single penalty assessment"—under which a penalty of $20 may be imposed "where the violation is not reasonably likely to result in a reasonably serious injury or illness, and is abated within the time set by the inspector." 30 C.F.R. § 100.4. The Commission has defined significant and substantial violations as those violations for which "there exists a reasonable likelihood that the haz-

*Senior Citizens v. Heckler,* 789 F.2d 931, 940 n. 12 (D.C.Cir.1986).

---

7. The Commission ultimately imposed a $150 fine.

ard contributed to will result in an injury or illness of a reasonably serious nature." *Cement Division, National Gypsum Co.,* 3 F.M.S.H.R.C. 822, 825 (1981); *see also Mathies Coal Co.,* 6 F.M.S.H.R.C. 1, 3–4 (1984); *Consolidation Coal Co.,* 6 F.M.S. H.R.C. 890, 897 (1986). A violation which has been designated as significant and substantial is therefore ineligible for assessment of a single penalty of $20 under 30 C.F.R. § 100.4, and the Secretary has interpreted the regulation to preclude the assessment of the $20 minimum penalty for any violation that has been so designated. *See* Brief for the Secretary of Labor at 32 n. 16 ("the Secretary has ... determined that violations that are serious enough to be designated significant and substantial are serious enough not to be eligible for MSHA's $20 minimum penalty.") On the other hand, MSHA apparently routinely applies the $20 penalty to violations that are not designated as significant and substantial. Consol's counsel noted at oral argument that, had the violation at issue not been a significant and substantial one, the penalty "would normally have been $20." We believe that the obvious connection between the significant and substantial finding and Consol's ineligibility for a smaller fine is a cognizable injury under the Act.

The designation of Consol's violation as significant and substantial injured Consol in another way as well. The fact that a particular violation has been deemed to be significant and substantial becomes part of a mine operator's record and may be used against the mine operator in the determination of civil penalties for subsequent violations. One of the statutory factors the Commission is directed to consider in assessing civil penalties is the "operator's history of previous violations." 30 U.S.C. § 820(i). In applying this statutory directive, MSHA has concluded that "violations which receive a single penalty assessment under § 100.4 and are paid in a timely manner will not be included in the computation" of previous violations. 30 C.F.R. § 100.3(c). Thus, violations that are labeled as significant and substantial figure prominently in the calculation of penalties for subsequent violations, while those viola-

tions which fall within the category for which significant and substantial violations are ineligible are "erased" from the mine operator's record. A finding that a violation is significant and substantial may also ultimately lead to the imposition of sanctions under § 104(e), 30 U.S.C. § 814(e), which provides for sanctions to be imposed on a mine operator after he is notified that "a pattern of [significant and substantial] violations" exists.

Our conclusion that Consol has demonstrated sufficient injury to satisfy the Article III "case or controversy" requirement is bolstered by this court's recent decision in *Meredith Corp. v. FCC,* 809 F.2d 863 (D.C.Cir.1987). In *Meredith,* the court held that the petitioner had standing to challenge the Federal Communications Commission's determination that its television station had violated the fairness doctrine, even though the Commission found that Meredith had subsequently acted in good faith and therefore no remedial action need be taken against it. *Id.* at 868–69. The court specifically rejected the FCC's argument that "[a]ny future adverse impact ... is too speculative to warrant review at this time," citing *Straus Communications, Inc. v. FCC,* 530 F.2d 1001 (D.C.Cir.1976), in which the court found that the degree of injury necessary to support jurisdiction existed "because the finding of a violation ... becomes a permanent part of the [violator's] record, which is enough of an injury in the context of a statute that provides harsher penalties for repeated violations." *Meredith,* 809 F.2d at 868. Here, the determination that Consol had committed a significant and substantial violation became part of Consol's record before the agency and had potential negative consequences for Consol beyond the mere finding of a violation.

█ We now turn to the issue of whether Consol's challenge is ripe for review under the two-part test set forth in *Abbott Laboratories.* The "fitness for review" prong of the *Abbott Laboratories* test requires the court to consider two types of institutional interests in determining whether a particular challenge is fit for

review. The agency has an interest in thinking through its policy choices and completing its decisionmaking process before its decision is subjected to judicial review. Even when the agency's decisionmaking process is complete, the court has an independent interest in postponing review until the agency's decision has actually been applied to the party seeking review, so that the issues are clearly presented in a fully developed factual context.

All of the factors traditionally considered by courts in determining whether the "fitness for review" prong of the *Abbott Laboratories* test has been met point in favor of immediate review of Consol's claim. The Commission's policy with respect to the designation of respirable dust violations as significant and substantial has been fully developed in final form and unconditionally applied to Consol, so that our review poses no danger of interrupting the agency's decisionmaking process. *See Eagle-Picher*, 759 F.2d at 913 ("the principal function of the ripeness doctrine is to aid a court in ascertaining whether it should stay its hand until agency policy has crystal-

lized"). The Secretary has never suggested that the Commission's application of its policy to Consol is not ripe for review, and in fact it appears that postponing review would be detrimental to the agency, leaving it uncertain as to its ability to impose the more serious sanctions available under §§ 104(d) and (e), which depend on initial findings that a violation is significant and substantial.[8] This court also has an interest in considering Consol's challenge now, rather than waiting until a "pattern" notice has been issued under § 104(e), as the dissent argues we should. The ALJ conducted a full evidentiary hearing and made detailed factual findings, so that the case is now presented to us in a concrete factual context. By the time a "pattern" notice is finally issued, the facts supporting the underlying violations will have grown stale. To attempt at that point to review what might be hundreds of prior findings that individual violations were significant and substantial, many of which might have been made years earlier, would be an impossible task.[9]

---

**8.** The dissent states that it finds this argument "highly suspect," citing *Chevron* as support for its conclusion that we should postpone review until the Secretary has interpreted the term "pattern" used in § 104(e). Diss. op. at 1094 n. 29. The Court made clear in *Chevron,* however, that deference to an agency's statutory interpretation is required only *after* the agency has actually interpreted the statute. *See Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) ("If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, *as would be necessary in the absence of an administrative interpretation,*") (emphasis added) (footnote omitted). Nothing in *Chevron* suggests that a court should hesitate to decide a properly presented issue of statutory construction in hopes that the agency will someday offer its own interpretation. In any event, the dissent's assertion has no relevance to this case, in which the agency has both interpreted the statutory "significant and substantial" designation and applied it to the petitioner.

**9.** The dissent responds that "individualized factual review" of such prior findings would be unnecessary, because "the only relevant question of fact would be whether respirable dust violations did occur as alleged by the Secretary," and proof that such violations occurred

will be "a matter of official record." Diss. op. at 1093 n. 27. This argument ignores the possibility that there may be specific factual challenges to the designation of a violation of the respirable dust standard as significant and substantial. In this case, for example, Consol argues that the dust samples at issue did not accurately reflect the mine atmosphere at the time the samples were taken, and that both these particular samples and dust sampling techniques in general are so inaccurate that they cannot support a finding that a violation of the respirable dust standard is significant and substantial. *See* Brief of Consolidation Coal Company at 19–29.

Alternatively, the dissent asserts that review of each prior finding that a violation was significant and substantial would be unnecessary, because the issue could be addressed in one across-the-board challenge to the presumption, "when properly presented in a section 104(e) case." Diss. op. at 1093 n. 27. The argument that we should postpone review of a specific application of the challenged presumption presented, as it is here, in a fully developed factual context, because we might at some later date be faced with a generalized challenge to the presumption, runs directly contrary to the purposes underlying the ripeness doctrine. One of the premises on which that doctrine rests is that courts are better able to decide issues presented in the context of a concrete application of the challenged agency action, rather than in a gen-

■ Under the ripeness analysis applied by this court to ordinary cases, we would be required to consider whether Consol has demonstrated sufficient hardship "to outweigh any institutional interests in the deferral of review." *Better Government Ass'n v. Department of State,* 780 F.2d 86, 92 (D.C.Cir.1986); *see State Farm,* 802 F.2d at 479–80; *Continental Air Lines v. Civil Aeronautics Board,* 522 F.2d 107, 124–25 (D.C.Cir.1974) (en banc). The typical case in which the ripeness issue arises is one in which the challenged agency decision, although it may well be final, has not yet been applied to the party seeking review. In these cases, the interests of the agency and the court are often perceived to favor postponement of judicial consideration of a challenge to the agency's action.[10] Some extra showing of hardship to the party seeking review may be required to outweigh those interests and tip the balance in favor of immediate review. *See*

*Action Alliance,* 789 F.2d at 940; *New York Stock Exchange v. Bloom,* 562 F.2d 736, 741 (D.C.Cir.1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978).

■ This case stands in sharp contrast to the typical ripeness case, however; here, the interests of both the court and the agency favor immediate review of the Commission's finding. Where, as in this case, there are no institutional interests favoring postponement of review, and in fact the agency and the court have a positive interest in immediate review, "there are no conflicting interests to balance." *Eagle-Picher,* 759 F.2d at 918.[11] It is enough that the petitioner show that it has suffered sufficient hardship to pass the Article III threshold. Because we have already determined that Consol has shown sufficient hardship to satisfy the constitutional requirement, it seems obvious that "[w]e

---

eral challenge not rooted in a specific application.

**10.** It is no accident that the cases in which the Supreme Court developed the ripeness doctrine involved preenforcement challenges to agency action. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). Pre-enforcement cases, in which the court is asked to review an agency decision without the factual context that a specific application of the challenged decision to the petitioner would provide, are more likely than cases arising in other contexts to present institutional interests in favor of deferring review.

This case does not involve a pre-enforcement challenge, however; Consol has already been found to have committed a significant and substantial violation of the respirable dust standard. The labeling of Consol as a "significant and substantial" violator and its consequent ineligibility for the $20 minimum penalty result from agency action that has already occurred, not from agency action that may or may not occur in the future, as in the pre-enforcement cases. Indeed, the dissent concedes that "there was enforcement under section 104(a) when the Secretary issued a citation to Consol for violation of a respirable dust standard." *See* diss. op. at 1100 n. 55.

**11.** The dissent cites two cases in which the court found that the issue presented was a purely legal question and that the challenged agency

decision was the agency's final position, but nonetheless went on to discuss the hardship prong of the *Abbott Laboratories* test. *See Better Government Ass'n v. Department of State,* 780 F.2d 86 (D.C.Cir.1986); *Capitol Technical Services, Inc. v. FAA,* 791 F.2d 964 (D.C.Cir.1986). In neither of these cases, unlike *Eagle-Picher,* did the court find that there were positive interests favoring immediate review. Both cases involved general challenges to agency decisions, without the factual context of specific applications of those decisions. *See Better Government,* 780 F.2d at 92 (facial challenge to Department of Justice guidelines and Department of the Interior regulation); *Capitol Technical Services,* 791 F.2d at 968–69 (challenge to FAA general policy). This case, as we have noted, presents a very different situation: the presumption challenged here has unquestionably been applied to Consol, and the case is presented in a fully developed factual context.

Neither *Better Government* nor *Capitol Technical Services* held, as the dissent seems to suggest, that the hardship prong of the *Abbott Laboratories* test is an independent requirement divorced from the consideration of the institutional interests of the court and agency. In fact, the court in *Better Government* specifically stated that a showing of hardship is required "[i]n order to outweigh any institutional interests in the deferral of review." 780 F.2d at 92. The mere discussion of the existence of hardship to the parties in these cases is in no way the equivalent of a holding that hardship beyond that necessary for Article III jurisdiction is always required, no matter how strong the interests in favor of immediate review.

need not proceed ... to the second prong of the *Abbott Laboratories* test." *Eagle-Picher*, 759 F.2d at 918;[12] *see also Midwestern Gas Transmission Co. v. FERC*, 589 F.2d 603, 621 (D.C.Cir.1978).

The dissent can point to no case in which the court has found that both the agency and the court have a positive interest in immediate review of the challenged agency action, but that the challenge is unripe because the petitioner has failed to show a hardship above and beyond that required for standing resulting from the action. To impose such a requirement would in effect convert the largely prudential doctrine of ripeness into an Article III "super-standing" requirement. The dissent apparently misconstrues our position, suggesting that we assert that "fitness for review" alone is always sufficient to make a claim ripe. *See* diss. op. at 1090 n. 7. Our holding is not that hardship is never required when a claim is "fit for review," but simply that when there are no interests favoring postponement of review, there can be no prudential reason to require the petitioner to demonstrate an additional quantum of injury caused by deferring review. The *Abbott*

*Laboratories* test does not impose an independent hardship requirement beyond that necessary for a "case or controversy" to exist. Rather, the ripeness doctrine requires only that a party seeking review show sufficient hardship to outweigh any interests the court or agency may have in deferring review.

The dissent cites cases in which this court found that the challenged agency action was "fit for review," but nonetheless proceeded to consider the hardship prong of the *Abbott Laboratories* test. *See* diss. op. at 1094 & n. 31. All but one of these cases were pre-enforcement cases in which the challenged agency action was one that had not yet been applied to the party seeking review.[13] *See American Federation of Government Employees v. FLRA*, 750 F.2d 143 (D.C.Cir.1984) (petitioner seeking review of FLRA statutory interpretation); *American Trucking Ass'ns v. ICC*, 747 F.2d 787 (D.C.Cir.1984) (ICC policy statement); *Alascom, Inc. v. FCC*, 727 F.2d 1212 (D.C.Cir.1984) (FCC announcement of policy); *Tennessee Gas Pipeline Co. v. FERC*, 736 F.2d 747 (D.C.Cir.1984) (FERC

---

12. The dissent correctly notes that *Eagle-Picher* involved "a statutory review provision that expresses a strong congressional preference concerning the timing of review." 759 F.2d at 918. Nevertheless, *Eagle-Picher* also stands for the proposition that, when institutional interests (of the court, the agency, or of Congress) strongly favor review, it would be senseless to thwart those interests by delaying review on prudential grounds, merely because the petitioner has not suffered extraordinary hardship from the challenged agency action. The dissent's attempt to characterize *Eagle-Picher* as a "narrow exception" to an absolute rule requiring special hardship in all cases, applicable only where Congress has explicitly indicated a preference for immediate review, *see* diss. op. at 1095, finds no support in *Eagle-Picher* itself or other ripeness decisions of this court or in *Abbott Laboratories*, which place no such limit on the court's power to determine when the balance tips in favor of immediate review.

13. In none of these cases did the interests of the court and agency point *toward* immediate review, as they do in this case. The court in *Eagle-Picher* specifically noted this distinction: In some of our decisions we have suggested that the court should consider "the hardship to the parties," even where the first prong of the *Abbott Laboratories* test is met. [citing three of the cases cited by the dissent in this

case] *In none of these cases, however, did we explicitly find that both the agency and the court had a positive interest in immediate review.*
759 F.2d at 918 (emphasis added).

The cases cited by our dissenting colleague as those in which this court has "postponed to a more appropriate time review of concededly 'final agency action' that imposed no present hardship," *see* diss. op. at 1101 & n. 64, also involve institutional concerns favoring deferral of review. *See Northern Natural Gas Co. v. FERC*, 780 F.2d 59, 63 (D.C.Cir.) (challenge to condition which would not be applied until after petitioner's next rate case was unripe where court could not determine validity of condition outside context of future ratemaking order), *reh'g en banc granted and opinion vacated in other part*, 780 F.2d 64 (D.C.Cir.1985); *Air New Zealand Limited v. Civil Aeronautics Board*, 726 F.2d 832, 837–38 (D.C.Cir.1984) (petitioner's challenge to condition providing for possible future termination of its authority to operate air service was unripe until condition actually applied); *Midwestern Gas Transmission Co. v. FERC*, 589 F.2d 603, 621 (D.C.Cir.1978) (possible hardship to petitioners outweighed by court's interest in "postponing review until these issues arise in a more concrete and final form").

interpretative rule); *Baltimore Gas & Electric Co. v. ICC,* 672 F.2d 146 (D.C.Cir. 1982) (ICC interpretative order).[14] In cases like those cited by the dissent, both the court and the agency have an interest in postponing review until the agency's decision is actually applied to the petitioner, so that the agency's policy will have crystallized, and the issue will be presented in the context of a concrete application. To justify review in such cases, the petitioner must show some special hardship resulting from the action.

Were the dissent's gratuitous interjection of a ripeness issue into this routine enforcement case to be accommodated, the result would be a strange one, indeed. The Secretary has determined, with the approval of the Commission, that citations issued under § 104(a) may contain both a finding that a violation was committed and a finding that the violation is significant and substantial. The dissent says that a mine operator may challenge the finding of a violation immediately, but must wait to challenge the designation of that violation as significant and substantial until a "pattern" notice is issued under § 104(e). *See* diss. op. at 1093 n. 27. This is piecemeal litigation at its nadir. It would require the mine operator to bring separate actions at separate times before separate courts to challenge two findings that are part of the same § 104(a) citation, even though the agency has determined that those findings are properly made together, and even though the findings will undoubtedly be based on the same underlying facts. It is small wonder that neither the Secretary nor the petitioner has asked for such a ruling.

■ But ultimately the detailed factual context in which this case is presented displays most visibly the deficiencies in the dissent's approach. One of the arguments Consol makes is that, while respirable dust sampling techniques might be accurate enough to serve as the basis for a finding that a violation of the standard has been committed, they are not accurate enough for a finding that such a violation is significant and substantial. *See* Brief of Consolidation Coal Company at 19–29. This is precisely the sort of issue which is far better decided "in the context of a specific application ... than ... in the framework of [a] generalized challenge." *Toilet Goods,* 387 U.S. at 164, 87 S.Ct. at 1524. The court stands on much firmer ground in deciding this issue on the basis of evidence about the accuracy of these particular samples rather than attempting to decide it later on the basis of allegations about the accuracy of respirable dust sampling in general. The ripeness doctrine favors postponement of review when a court believes that it would be better able to decide the case in the concrete factual context of a specific application of the challenged agency decision. *See Andrade v. Lauer,* 729 F.2d 1475, 1480–81 (D.C.Cir.1984). What the dissent asks us to do is to refuse *on prudential grounds* to decide the issue of whether the Commission has properly presumed that all violations of the respirable dust standard are significant and substantial, even though that issue is presented to us in the fully developed factual context of a specific application of the presumption. The dissent reasons that the court might be able to decide the issue in a single across-the-board challenge without that factual context, *see* diss. op. at 1093 n. 27, if at some later time such a generalized challenge to the presumption were raised. The argument that a court should refuse to review a specific application of a challenged agency policy because a general

**14.** In *Air New Zealand Limited v. Civil Aeronautics Board,* the other case cited by the dissent, the petitioner sought review of an order granting it authority to provide service between Los Angeles and London on flights originating or terminating in New Zealand. 726 F.2d 832, 833 (D.C.Cir.1984). The condition provided that the authority would terminate if the aviation regulatory authorities in New Zealand took certain actions in the future. The court held that review of petitioner's challenge should be delayed until the termination actually occurred. *Id.* at 838. In *Air New Zealand,* there were especially strong institutional interests in delaying review because the case involved questions of the proper interpretation of an international aviation agreement, which could best be resolved through "the normal administrative process, which in this case includes the diplomatic process as well." *Id.*

challenge to that policy may later be presented turns ripeness doctrine on its head. Adoption of the dissent's approach would thwart the interests of all three interested parties in immediate review of Consol's claim: the court, the agency, and the petitioner. We conclude that the issue presented should be decided now and hold that this case is ripe for adjudication.

## B. *The Presumption That Any Violation of the Respirable Dust Standard Is Serious and Substantial*

■ Consol challenges the Commission's adoption of a presumption that violations of the respirable dust standard are significant and substantial, arguing that this presumption conflicts with the Mine Act's overall enforcement scheme and lacks a rational basis. Consol asserts that the Mine Act requires the Commission, before it designates a violation as significant and substantial, to make a finding that the particular violation at issue poses a serious danger to miners, and that the Commission in this case has improperly substituted a presumption for that finding. Consol cites *United Scenic Artists, Local 829 v. NLRB*, in which this court invalidated the NLRB's presumption that a union charged with violating the secondary boycott provision by coercing a neutral employer had knowledge of the employer's neutral status. 762 F.2d 1027 (D.C.Cir.1985). The court noted that "an agency is not free to ignore statutory language by creating a presumption on grounds of policy to avoid the necessity for finding that which the legislature requires to be found," and held that, in adopting the presumption, the Board had exceeded its statutory authority. *Id.* at 1034–35.

We conclude that *Scenic Artists* is inapposite to this case, however. The determination of the likelihood of harm from a violation of an exposure-based health standard necessarily rests on generalized medical evidence concerning the effects of exposure to the harmful substance, rather than on evidence specific to a particular violation.[15] Unlike the presumption in *Scenic Artists*, which involved a factual question of intent requiring consideration of "the actual facts and the relationships between and among the various parties," 762 F.2d at 1035, in this case there were no "actual facts" to be considered beyond the fact that a violation of the respirable dust standard had occurred. Once the Commission had determined on the basis of medical evidence that any violation of the respirable dust standard should be considered significant and substantial, it would be meaningless to require that the same findings be made in each individual case in which a violation occurs.[16]

Consol also objects to the particular presumption chosen by the Commission, arguing that because the Mine Act creates a graduated enforcement scheme, with more severe penalties imposed for more severe violations, the standard for designation of a violation as significant and substantial must necessarily be higher than the 2.0 mg/m$^3$ required for a mere violation. As we noted in our discussion of ripeness, however, the fact that a particular violation has been designated as significant and substantial, *without more*, does not result in the imposition of any additional sanction under the Mine Act (although it may lead to the assessment of a larger fine under MSHA regulations). Accordingly, we can-

---

**15.** In contrast, the determination of whether a violation of a safety standard is significant and substantial may depend on the specific factual circumstances surrounding the violation. *Cf. Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 589–90 (D.C.Cir.1985).

**16.** Consol also argues that the Commission has adopted an "irrebuttable presumption" that any respirable dust violation involving exposure of miners is significant and substantial, and that this presumption is invalid as a denial of due process, regardless of its consistency with the Mine Act. Again, this argument ignores the

unique nature of an exposure-based health standard. The Commission necessarily must adopt a general policy concerning whether violations of the respirable dust standard will be designated as significant and substantial. The only evidence that would be relevant to show that such a policy should not be applied in a particular case is evidence that miners were not actually exposed to excessive concentrations of respirable dust. The Commission specifically held that the presumption could be rebutted by presentation of evidence of lack of exposure. 8 F.M.S.H. R.C. at 899.

not say that Congress intended that some concentration of respirable dust higher than 2.0 mg/m$^3$ be found before a violation of the respirable dust standard could be designated as significant and substantial.

The designation of all respirable dust violations as significant and substantial is consistent with the Secretary's longstanding practice in enforcing the Mine Act. Before the issuance of the *National Gypsum* decision in 1981, virtually all violations of mandatory health and safety standards had been designated as significant and substantial. *See* 8 F.M.S.H.R.C. at 895 ("Prior to the Commission's *National Gypsum* decision, the Secretary of Labor's enforcement policy was to regard all violations of mandatory standards as significant and substantial, except violations that were technical in nature or that posed only a remote risk of injury.") While the Commission in *National Gypsum* and *Mathies Coal Co.* departed from its past practice with respect to the designation of violations of safety standards as significant and substantial, it reasonably concluded that violations of the respirable dust standard should continue to be designated as significant and substantial because of the "fundamental differences between a typical safety hazard and the respirable dust exposure-related health hazard at issue." 8 F.M.S.H.R.C. at 895.

The legislative history of the Federal Mine Safety and Health Amendments Act suggests that Congress intended all except "technical violations" of mandatory standards to be considered significant and substantial. The 1977 amendments redesignated § 104(c) of the Coal Act as § 104(d) of the Mine Act without substantive change. The Commission's predecessor, the Interior Board of Mine Operations Appeals ("Board"), had given a broad reading to the "significant and substantial" language of § 104(c)(1) of the Coal Act:

> Section 104(c)(1), it should be recalled, mandates the issuance of a notice when an inspector finds that "... a violation is of such nature as could significantly and substantially contribute to the cause and effect of a mine safety or health hazard...." Our position now is that these words, when applied with due regard to their literal meanings, appear to bar issuance of notices under section 104(c)(1) in two categories of violations, namely, violations posing no risk of injury at all, that is to say, purely technical violations, and violations posing a source of *any* injury which has only a remote or speculative chance of coming to fruition. A corollary of this proposition is that a notice of violation may be issued under section 104(c)(1) without regard for the seriousness or gravity of the injury likely to result from the hazard posed by the violation, that is, an inspector need not find a risk of serious bodily harm, let alone of death.

*Alabama By-Products Corp.*, 7 I.B.M.A. 85, 94 (1976) (emphasis in original). The Senate Report on the Mine Act, in discussing the proper interpretation of the "significant and substantial" language, noted the *Alabama By-Products* decision with approval: "The Board's holding in *Alabama By-Products Corporation* is consistent with the Committee's intention that the unwarranted failure citation is appropriately used for all violations, whether or not they create a hazard which poses a danger to miners as long as they are not of a purely technical nature." S.Rep. No. 181, 95th Cong., 1st Sess. 31, *reprinted in* 1977 U.S. Code Cong. & Admin.News 3401, 3431. The Commission's adoption of the presumption at issue here is consistent with congressional intent in enacting the Mine Act, and specifically with Congress's use of the "significant and substantial" language.

Finally, Consol argues that the presumption adopted by the Commission lacks a rational basis, because short-term exposure to respirable dust can never result in a significant and substantial violation. Consol notes that Congress adopted the 2.0 mg/m$^3$ standard on the basis of studies of the effects of long-term exposure of miners to respirable dust. *See* H.R.Rep. No. 563, 91st Cong., 1st Sess. 18, *reprinted in* 1969 U.S.Code Cong. & Admin.News 2503, 2521 ("In a dust environment below about 2.2 mg/m$^3$, there is virtually no probability of a miner contracting pneumoconiosis ..., even

after 35 years of exposure to such concentration.") Therefore, Consol asserts, no rational connection has been shown between short-term exposure to coal dust and the development of coal workers' pneumoconiosis and other respiratory diseases. *See Scenic Artists*, 762 F.2d at 1034 (presumption is invalid where there is no "rational nexus between the proven facts and the presumed facts.")

Consol's argument fails to consider the inherent difficulties in enforcing a health standard designed to prevent diseases caused by the cumulative effects of repeated overexposure to a harmful substance. The harmful effect of any one incident of exposure to excessive concentrations of respirable dust is negligible—as the ALJ phrased it, a "drop in the bucket." Thus, acceptance of Consol's argument would mean that *no* single violation of the respirable dust standard could ever be designated as significant and substantial. *See* Reply Brief of Consolidation Coal Company and the American Mining Congress at 2. This result cannot be reconciled with congressional intent in enacting the respirable dust standard. Congress did not require that dust concentrations be maintained below 2.0 mg/m$^3$ over the long term; it required mine operators to "continuously" maintain the concentration of respirable dust at or below that level "during each shift." 30 U.S.C. § 842(b)(2). Consol's position would preclude the application of sanctions under §§ 104(d) and 104(e) on the basis of a mine operator's violation of the respirable dust standard, no matter how severe or how often repeated. That cannot

have been Congress's intent. We agree with the Commission that "Congress clearly intended the full use of the panoply of the Act's enforcement mechanisms to effectuate [the goal of preventing respiratory disease], including the designation of a violation as a significant and substantial violation." 8 F.M.S.H.R.C. at 897.

### C. *The Accuracy of Respirable Dust Sampling Procedures*

Consol also challenges the accuracy of the sampling procedures adopted by the Secretary to measure concentrations of respirable dust. Many of Consol's arguments were considered and rejected by the Tenth Circuit in *American Mining Congress ("AMC") v. Marshall*, 671 F.2d 1251 (10th Cir.1982), in which the court upheld the designated area sampling regulations promulgated in 1980. In that case, AMC did not challenge the designated occupation sampling program, which had existed before the new dust sampling regulations were promulgated and had previously been known as "high risk occupation sampling." The court noted, however, that "the designated occupation sampling program is itself an area sampling program." *Id.* at 1256. The court concluded that "[s]ince there is no perfect sampling method, the Secretary has discretion to adopt any sampling method that approximates exposure with reasonable accuracy," and that the area sampling was "reasonably calculated to prevent excessive exposure to respirable dust." *Id.*[17]

---

17. Consol and *amicus* AMC argue that *AMC v. Marshall* can be distinguished from this case because the Tenth Circuit did not decide whether the respirable dust sampling procedures were accurate enough to permit MSHA to determine that a violation of the respirable dust standard was significant and substantial. Noting that the question of whether miners are actually exposed to excessive levels of dust, "while not a prerequisite to finding a violation, is critical to the determination whether a violation is significant and substantial," they argue that the Tenth Circuit merely held that the area sampling regulations were not arbitrary and capricious, but did not consider whether samples taken under those regulations accurately reflected miner exposure. *See* Brief of Consolidation Coal Company at 27;

Brief for *Amicus Curiae* American Mining Congress at 39. It is clear, however, that the question of the extent to which designated area samples reflect actual miner exposure was considered in *AMC v. Marshall*. The court noted that the petitioner had argued that the area sampling program did not provide an accurate measure of any individual miner's exposure, so that a mine operator might be cited for a violation of the respirable dust standard on the basis of area samples, even though no one miner's actual exposure exceeded the standard. 671 F.2d at 1255. The court rejected this argument, concluding that the sampling method adopted by the Secretary provided a reasonable approximation of actual exposure. *Id.*

Before this court, Consol argues that dust sampling techniques are inherently so inaccurate that a respirable dust violation can never properly be designated as significant and substantial. This argument is inconsistent with congressional intent in enacting the respirable dust standard, however. The standard was developed on the basis of British epidemiological studies of the effects of exposure to various concentrations of coal dust on the prevalence of coal workers' pneumoconiosis among miners. *See* S.Rep. No. 91–411, 91st Cong., 1st Sess. 15–16 (1969). Those studies collected data on levels of respirable dust using the Mining Research Establishment ("MRE") sampling instrument, and Congress initially established the MRE device as the instrument of reference for measuring concentrations of respirable dust. *See* 30 U.S.C. § 842(e) (1976) (superseded) (defining "concentrations of respirable dust" as "the average concentration of respirable dust if measured with an MRE instrument or such equivalent concentrations if measured with another device approved by the Secretary")[18] The MRE instrument suffers from the same defects (collection of materials other than coal dust and collection of oversized, nonrespirable particles, for example) that Consol asserts make dust sampling techniques so inaccurate that they cannot serve as the basis for a finding that a violation is significant and substantial. As the Commission noted in its decision in this case, the 2.0 mg/m$^3$ standard, which was adopted on the basis of studies using the MRE instrument, reflects the fact that samples taken with that instrument will inevitably include materials other than coal dust, as well as oversized particles. 8 F.M. S.H.R.C. at 901. Because the MRE sampling instrument, like all other sampling devices, is "less than perfect and ... de-signed to provide only estimates of actual exposure," the fact that Congress enacted a sampling program using that instrument "indicates that it intended some error to be tolerated in enforcement of the dust standard." *AMC v. Marshall*, 671 F.2d at 1256. Further, as the Tenth Circuit noted, MSHA regulations governing dust sampling procedures include a number of provisions which "minimize variability stemming from human and mechanical error." *Id.* at 1259. The regulations provide for multiple shift sampling, for example, so that compliance is determined based on the average of a number of samples taken during consecutive shifts. 30 C.F.R. §§ 70.207(a), 70.-208(c), 70.210(a)(4). In addition, the regulations require that all sampling, as well as calibration and maintenance of sampling devices, be performed by persons who have been certified by the MSHA after passing a competence examination. 30 C.F.R. §§ 70.-202, 70.203. The sampling devices used must be calibrated after each 200 hours of operation and must be examined, tested, and maintained before each use. 30 C.F.R. §§ 70.204(b), 70.204(d). Despite all of these attempts to minimize variability, however, it is clear that some inaccuracy in coal dust sampling techniques remains. Nevertheless, in view of Congress's undeniable concern with the prevention of diseases caused by respirable dust, it is highly unlikely that Congress intended to shelter violations of the respirable dust standard from the more severe sanctions provided for under the Act, simply because of the possibility of some inaccuracy in sampling techniques.[19]

Finally, Consol argues that the specific samples at issue in this case did not accurately reflect the actual mine atmosphere at the time the samples were taken.

18. In 1977, Congress redefined "concentrations of respirable dust" as "the average concentration of respirable dust measured with a device approved by the Secretary." 30 U.S.C. § 842(e).

19. Consol also objects to MSHA's policy of microscopically examining dust samples for contaminants or oversized particles only if they test at a concentration level of 8.6 mg/m$^3$ or higher. The policy was adopted on the basis of evidence that the statistical probability that sam-ples below the 8.6 level contain a significant number of oversized particles is very low. *See* J.A. at 304a–308a (testimony of chief of Dust Division of MSHA's Pittsburgh Technology Center). We conclude, as did the Tenth Circuit in *AMC v. Marshall,* that the Secretary acted within his discretion in refusing to examine samples testing at lower than 8.6 mg/m$^3$. 671 F.2d at 1260.

As evidence of the alleged inaccuracy, Consol points to the fact that three of the samples showed concentrations of dust considerably higher than the other two samples taken during this bimonthly measurement period and samples taken on the same working section at other times. Consol notes that it requested that two of the violative samples, which tested at 5.1 and 6.3 mg/m$^3$, be checked for contamination or oversized particles, and it argues that the third sample, which tested at 8.1 mg/m$^3$, could not have been accurate because conditions that dusty would have been immediately obvious. Consol speculates that the three samples that were above the 2.0 level must have resulted from a malfunction in the sampling machine, because "[t]he only act necessary to achieve abatement was to 'babysit' the sampling device to ensure its reliable functioning." Brief of Consolidation Coal Company at 8–9. In arguing that the inaccuracy of the samples precludes the designation of its violation as significant and substantial, Consol ignores the fact that the Mine Act requires that "[e]ach operator of a coal mine shall take accurate samples of the amount of respirable dust in the mine atmosphere," 30 U.S.C. § 842(a), and that MSHA regulations set forth detailed procedures for mine operators to follow in taking those samples. See 30 C.F.R. §§ 70.-202, 70.203, 70.204, 70.207, 70.208. We conclude that the risk of failing to "babysit" the sampling machine sufficiently to ensure that it was functioning properly while the samples were taken falls on Consol. Consol lists a number of factors which may cause a dust sample to be inaccurate, including defects in sampling equipment, misuse of the equipment, and deliberate contamination by miners, see Brief of Consolidation Coal Company at 22–24, but presents no evidence to show that the particular samples at issue were affected by any of these factors. See 5 F.M.S.H.R.C. at 380 (ALJ's opinion) ("There is no evidence in this record that the samples which resulted in the citation involved herein were affected by misuse, deliberate contamination, improper miner work habits, or defective equipment.") The Commission recognized that its conclusion that MSHA's sampling procedures are accurate enough to permit the designation of respirable dust violations as significant and substantial did not preclude an operator from proving that "the accuracy of the sampling or testing results *in a particular instance* was compromised, thereby defeating the allegation of a violation as well as a significant and substantial finding." 8 F.M.S.H.R.C. at 902 (emphasis in original). Because Consol presented no persuasive evidence that the samples on which this violation was based were inaccurate, the Commission properly rejected this challenge.

## III. CONCLUSION

The Commission's adoption of a presumption that violations of the respirable dust standard are significant and substantial is rational and consistent with congressional intent in enacting the respirable dust standard and the enforcement provisions of the Mine Act. In addition, the procedures used to measure concentrations of respirable dust are sufficiently accurate to support a determination that a respirable dust violation is significant and substantial. Accordingly, the petition for review is

*Denied.*

HARRY T. EDWARDS, Circuit Judge:

I am pleased to concur, without any reservations, in the excellent opinion of Chief Judge Wald. I write only to emphasize the point that, under the ripeness doctrine, the hardship prong of the *Abbott Laboratories* test is *not* an independent requirement divorced from the consideration of the institutional interests of the court and agency. *Better Government,* which I authored, surely cannot reasonably be construed to suggest such a requirement. The precedent in this circuit is clear that a litigant must demonstrate "hardship" *only* when necessary to outweigh institutional interests that militate in favor of deferral of review.

Indeed, it would make no sense whatsoever to compel a litigant who has a valid case or controversy, cause of action, stand-

ing and proper jurisdiction to prove some sort of "hardship" before allowing the litigant to seek judicial review. Under such a rule, some litigants might forever be barred from seeking judicial review for want of a showing of "hardship." The ripeness doctrine was never intended to produce such a principle. The dissent's suggestion to the contrary is, in my view, flatly wrong.

D.H. GINSBURG, Circuit Judge, dissenting:

Consolidation Coal Co. (Consol) concedes that in February, 1982 it violated a respirable dust standard established by the Federal Mine Safety and Health Act of 1977 (Mine Act)[1] and regulations of the Secretary of Labor (Secretary). As a result, Consol cannot, and does not, contest the Secretary's authority under sections 104(a) and 110(a) of the Mine. Act[2] to issue a citation to it and to assess a civil fine against it.

Rather than contesting the citation itself, Consol has objected to a finding, noted on the citation by the Mine Safety and Health Administration (MSHA) inspector, that the violation was one that "could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard" (i.e., was "significant and substantial"). That the finding was actually noted on the citation, though, is of no consequence in deciding this case. The Secretary had previously adopted an enforcement presumption that any violation of a respirable dust standard would be deemed "significant and substantial," which, as shown below, means it could count toward a later citation based on a pattern of "significant and substantial" violations. The inspector's "significant and

substantial" finding was therefore a foregone conclusion once Consol had been cited for a respirable dust violation, and by noting this finding on the citation, the inspector simply stated what everyone already knew to be the case. Thus, this appeal stands on no different footing than it would if the inspector had omitted the notation and left Consol to deduce for itself that the Secretary presumed the violation to be "significant and substantial."

Regardless of whether it was spelled out, however, the "significant and substantial" presumption had no impact whatsoever on Consol. It is sheer speculation for the court to suggest that, but for the designation, Consol would have been fined $20 rather than $150. Furthermore, the likelihood of the Secretary relying on this violation in the future in order to establish a "pattern" of violations is virtually nil. First, the Secretary has not yet developed guidelines for determining when a "pattern" exists under section 104(e) of the Mine Act.[3] Second, five years have passed since this citation was issued, during which no "pattern" notice has been given involving this violation. It is highly improbable that, regardless of how the Secretary eventually defines a "pattern," he would henceforth be able to rely on this violation to establish one. Given that the Secretary's policy in this area is undeveloped, that the harm to Consol is entirely conjectural, and that adequate judicial relief from the order below would be available if it ever has any adverse effect in the future, this case fails to satisfy either the "fitness for review" or the "hardship" requirement for ripeness.[4] Therefore, Consol's petition should be dismissed, and I dissent from the court's decision to reach the merits of this case.

1. The Mine Act is comprised of the Federal Coal Mine Health and Safety Act of 1969, Pub.L. 91–173, as amended by the Federal Mine Safety and Health Amendments Act of 1977, Pub.L. 95–164. The Mine Act is codified at 30 U.S.C. § 801 *et seq.* (1982).

2. 30 U.S.C. §§ 814(a), 820(a) (1982).

3. *See id.* § 814(e).

4. The line dividing the prudential requirement of ripeness from the constitutional requirement of standing is "difficult to discern and unnecessary to identify." *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 940 n. 12 (D.C.Cir. 1986). It is clear, however, that a case may be unripe even when the petitioner has standing. *See id.* at 939–40. Because this case should be dismissed on ripeness grounds, I do not address whether Consol has standing to object to the Secretary's enforcement presumption.

## I. THE RIPENESS REQUIREMENT

Any ripeness inquiry must set forth from *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), in which the Supreme Court stated that

> the ripeness doctrine['s] ... basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a two-fold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Id.* at 148–49, 87 S.Ct. at 1515 (footnote omitted). *See Toilet Goods Association, Inc. v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Gardner v. Toilet Goods Association, Inc.*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). Although we approach ripeness questions in a "pragmatic and commonsense" manner,[5] our analysis must accord with well-established principles that the court has consistently applied over the years.

Whether a claim presented to the court satisfies the prudential requirements of ripeness is a question distinct from whether an agency action is "final" for jurisdictional purposes.[6] A claim is ripe if the legal issue presented is "fit" for review *and* the petitioner has suffered "hardship."[7] As the passage from *Abbott Laboratories* quoted above indicates, the "fitness" prong of the ripeness doctrine protects the interests of the agency by preventing judicial intervention that would hin-

---

5. *Eagle-Picher Indus. v. United States EPA*, 759 F.2d 905, 918–19 (D.C.Cir.1985).

6. *See Toilet Goods v. Gardner*, 387 U.S. at 162–64, 87 S.Ct. at 1523–24; *State Farm Mut. Auto Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C.Cir. 1986), *cert. denied sub nom. New York v. Dole*, —— U.S. ——, 107 S.Ct. 1616, 94 L.Ed.2d 808 (1987); *Alascom, Inc. v. FCC*, 727 F.2d 1212, 1217 (D.C.Cir.1984); *Air New Zealand Ltd. v. CAB*, 726 F.2d 832, 836–37 (D.C.Cir.1984); *Midwestern Gas Transmission Co. v. FERC*, 589 F.2d 603, 620 (D.C.Cir.1978). Thus, even though a court may have jurisdiction to review an agency action because that action is "final," the court may defer review of some or all of a petitioner's claims if prudential concerns counsel postponing review until a later date. When confronted with a broad-based attack on an agency action, this court therefore conducts a claim-by-claim analysis of ripeness. *See State Farm Mut. Auto Ins. Co. v. Dole*, 802 F.2d at 480–85; *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d at 940–42.

7. Contrary to the court's assertion, maj. op. at 1081 satisfying the "fitness" standard alone does not make a case ripe for review; "hardship" must also be shown, in addition to the injury necessary for standing. *See Abbott Laboratories v. Gardner*, 387 U.S. at 149, 87 S.Ct. at 1515; *Toilet Goods v. Gardner*, 387 U.S. at 164, 87 S.Ct. at 1524; *American Fed'n of Gov't Employees v. FLRA*, 750 F.2d 143, 144 (D.C.Cir. 1984); *American Trucking Ass'n, Inc. v. ICC*, 747 F.2d 787, 790 (D.C.Cir.1984); *Alascom, Inc. v. FCC*, 727 F.2d at 1217; *Tennessee Gas Pipeline Co. v. FERC*, 736 F.2d 747, 749 (D.C.Cir.1984); *Air New Zealand Ltd. v. CAB*, 726 F.2d at 838; *Baltimore Gas & Elec. Co. v. ICC*, 672 F.2d 146, 149 (D.C.Cir.1982). As I show below, *infra* at 1095–96, the court's error results from its misreading of *Eagle-Picher v. United States EPA*, *supra* note 5.

The court notes correctly, however, maj. op. at 1081, that some of this court's opinions have broadly suggested that sufficient hardship may "outweigh any institutional interests in the deferral of review." *Better Government Ass'n v. Department of State*, 780 F.2d 86, 92 (D.C.Cir. 1986). *See State Farm Mut. Auto Ins. Co. v. Dole*, 802 F.2d at 479–80; *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d at 940; *Eagle-Picher Indus. v. United States EPA*, 759 F.2d at 915 & n. 15; *Public Citizen Health Research Group v. Com'r FDA*, 740 F.2d 21, 31 (D.C.Cir. 1984); *Midwestern Gas Transmission Co. v. FERC*, 589 F.2d at 618; *Diamond Shamrock Corp. v. Costle*, 580 F.2d 670, 672 (D.C.Cir.1978); *New York Stock Exchange v. Bloom*, 562 F.2d 736, 740–41 (D.C.Cir.1976), *cert. denied sub nom. New York Stock Exchange v. Heimann*, 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978); *Continental Air Lines, Inc. v. CAB*, 522 F.2d 107, 124–25 (D.C.Cir.1974) (en banc). This assertion, which has always been dicta, seems highly problematic; first, it is unlikely that the legal issues will be unfit for review when significant hardship has been imposed (I am aware of no such instance); and second, if a case is truly unfit for review, then review is improper, as a matter of law, notwithstanding the hardship imposed. *Cf. Papago Tribal Utility Authority v. FERC*, 628 F.2d 235, 243 (D.C.Cir.), *cert. denied*, 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980).

der "further policy evolution."[8] Agency interests are not the exclusive concern of the "fitness" requirement, however. Requiring that an issue be "fit" for review also serves the court's interest, by postponing review until the policy is applied in an adequately developed factual context, one that clearly reveals the contours of the policy and, therefore, its lawfulness.[9]

To be ripe for review, the agency action must also impose "hardship," i.e., "the impact of the administrative action could be said to be felt immediately by those subject to it in conducting their day-to-day affairs."[10] There is sufficient "hardship" when the agency action either inflicts "immediate and significant" harm upon the petitioner[11] or else confronts it with a "hard choice between compliance certain to be disadvantageous and a high probability of strong sanctions."[12] The "hardship" requirement is not satisfied, however, when the petitioner complains of prospective but completely conjectural harm,[13] and "no irremediable adverse consequences flow from requiring a later challenge" if and when the feared contingency arises.[14]

## II. BACKGROUND

Here Consol objects to the "significant and substantial" designation because, it contends, the respirable dust violation was "an episodic affair," caused merely by the malfunctioning of a sampling device, and "an episodic affair at that level [of exposure] will *not* adversely affect the health of any miners."[15] As a result, it argues, this violation could not have been "significant and substantial." From this Consol draws the conclusion that Congress did not intend a "single short-term violation"[16] to trigger the Mine Act's "most severe enforcement tools"[17]—the Secretary's withdrawal authority under sections 104(d) and 104(e) of the Mine Act.[18] The Administrative Law Judge, the Commission, and now the court

8. *Capitol Technical Services, Inc. v. FAA*, 791 F.2d 964, 969 (D.C.Cir.1986). *See Better Government Association v. Department of State*, 780 F.2d at 92; *American Trucking Ass'n, Inc. v. ICC*, 747 F.2d at 790.

9. *See Toilet Goods v. Gardner*, 387 U.S. at 164, 87 S.Ct. at 1524 ("judicial appraisal of [an issue] is likely to stand on a much surer footing in the context of a specific application of this regulation than could be the case in the framework of [a] generalized challenge"); *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d at 941–42; *Reynolds Metal Co. v. FERC*, 777 F.2d 760, 762 (D.C.Cir.1985); *American Trucking Ass'n, Inc. v. ICC*, 747 F.2d at 789–90; *South Carolina Electric & Gas Co. v. ICC*, 734 F.2d 1541, 1546 (D.C.Cir.1984); *Air New Zealand Ltd. v. CAB*, 726 F.2d at 837; *Midwestern Gas Transmission Co. v. FERC*, 589 F.2d at 620; *Diamond Shamrock Corp. v. Costle*, 580 F.2d at 674.

10. *Toilet Goods v. Gardner*, 387 U.S. at 164, 87 S.Ct. at 1524.

11. *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d at 940–41. In addition to *Action Alliance*, such harm has been found recently in *Capitol Technical Services, Inc. v. FAA*, 791 F.2d at 969, and *Better Government Association v. Department of State*, 780 F.2d at 94.

12. *Tennessee Gas Pipeline Co. v. FERC*, 736 F.2d at 751; *See Abbott Laboratories v. Gardner*, 387 U.S. at 153, 87 S.Ct. at 1517; *Gardner v. Toilet Goods*, 387 U.S. at 171–74, 87 S.Ct. at 1528–30; *Ciba-Geigy Corp. v. United States EPA*, 801 F.2d 430, 439 n. 10 (D.C.Cir.1986); *Arkansas Power &*

*Light Co. v. ICC*, 725 F.2d 716, 725–26 (D.C.Cir. 1984); *Webb v. Department of Health & Human Services*, 696 F.2d 101, 107–08 (D.C.Cir.1982).

13. *See National Latino Media Coalition v. FCC*, 816 F.2d 785, 790 (D.C.Cir.1987); *State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d at 480–82; *Hastings v. Judicial Conference of United States*, 770 F.2d 1093, 1100–02 (D.C.Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 3272, 91 L.Ed.2d 562 (1986); *Tennessee Gas Pipeline Co. v. FERC*, 736 F.2d at 749–50; *Alascom, Inc. v. FCC*, 727 F.2d at 1220; *Air New Zealand Ltd. v. CAB*, 726 F.2d at 837–38; *Arkansas Power & Light Co. v. ICC*, 725 F.2d at 725–26; *Baltimore Gas & Elec. Co. v. ICC*, 672 F.2d at 148–49; *Midwestern Gas Transmission Co. v. FERC*, 589 F.2d at 623–24.

14. *Toilet Goods v. Gardner*, 387 U.S. at 164, 87 S.Ct. at 1524. *See National Latino Media Coalition v. FCC*, 816 F.2d at 790; *State Farm Mut. Auto Ins. Co. v. Dole*, 802 F.2d at 481; *Hastings v. Judicial Conference of United States*, 770 F.2d at 1100–02; *Tennessee Gas Pipeline Co. v. FERC*, 736 F.2d at 751; *Alascom, Inc. v. FCC*, 727 F.2d at 1220.

15. Brief of Consolidation Coal Company at 33 (emphasis in original).

16. Reply Brief of Consolidation Coal Company and the American Mining Congress at 2.

17. Brief of Consolidation Coal Company at 10.

18. 30 U.S.C. § 814(d), (e).

have all addressed the question as it was framed by Consol, *i.e.*, whether the Secretary may presume that an isolated violation of this type "could significantly and substantially contribute to the cause and effect of a ... safety or health hazard." [19]

Under section 104(e), the only provision relevant to this case,[20] a particular "significant and substantial" violation has no consequence in isolation [21]; it can operate only as one of a series of such violations to form a "pattern." When the Secretary finds that a pattern of "significant and substantial" violations has occurred, he must so notify the operator.[22] Thereafter, if the operator commits another "significant and substantial" violation, the Secretary must issue a withdrawal order.[23]

As far as the record indicates, the Secretary has issued no "pattern" notice involving the respirable dust violation before us. Furthermore, as the court omits to mention, the Secretary has not even developed a policy for determining in specific cases whether a "pattern" of violations exists. Instead, all that has happened to date is that the inspector designated the particular violation as "significant and substantial," which constituted nothing more than an application of the presumption contained in the Secretary's enforcement guidelines. Thus, although the inspector did issue a citation and assess a fine under sections 104(a) and 110(a) of the Mine Act, no enforcement action has been taken under section 104(e).

### III. FITNESS FOR REVIEW

Given the facts that are before us, I believe that the validity of the "significant and substantial" finding is not "fit" for review. The Secretary's policy in applying section 104(e) is not only still "evolving," it does not even exist at the present because he has not as yet determined what constitutes a "pattern" of respirable dust violations. Furthermore, as the court acknowledges,[24] Consol's argument that Congress did not intend to authorize a withdrawal order for a one-time violation of this sort is true but it is also without significance. Congress in section 104(e) intended to authorize withdrawal orders for a "pattern" of violations, and so in order to determine whether Congress intended a section 104(e) withdrawal order in any particular circumstance—presumably a circumstance involving more than a single violation—we would have to await a finding by the Secretary that a "pattern" exists and then review that "pattern" finding. It may be that the manner in which the Secretary defines the term "pattern" will render Consol's argument about one-time violations irrelevant, e.g., by requiring numerous violations before a "pattern" is established.[25] Because Consol's critique of the Secretary's presumption may lose all basis when "further

---

19. *See* maj. op. at 1075–77, 1084–86, 1087.

20. Section 104(d) comes into play only when a "significant and substantial" violation has been "caused by an unwarrantable failure of [the] operator to comply with [a] mandatory safety or health standard [ ]"; since the inspector did not allege an "unwarrantable failure" in this case, section 104(d) is not, even *in futuro*, implicated here.

21. The court acknowledges this point: "[T]he fact that a particular violation has been designated as significant and substantial, without more, does not result in the imposition of any additional sanction under the Mine Act...." Maj. op. at 1084.

22. Mine Act § 104(e)(1), 30 U.S.C. 814(e)(1).

23. *Id.*

24. *See* maj. op. at 1084.

25. *Cf. Action Alliance of Senior Citizens v. Heckler*, 789 F.2d at 941 ("To hold the [agency's] provision invalid on its face, a court would have to conclude that the provision stands in conflict with the statute regardless of how the agency exercises its discretion. Before so ruling, a court would be obliged to perceive and consider the various ways in which the agency might use its discretion."); *Papago Tribal Utility Authority v. FERC*, 628 F.2d at 240 ("Perhaps the Commission will resolve the claims of the parties and obviate any injury to them if we allow it to complete its proceedings. Thus we would be 'decid[ing] hypothetical questions and wast[ing] appellate resources by intervening at this stage.' *Green v. Dep't. of Commerce*, 618 F.2d 836, 839 (D.C.Cir.1980).").

policy evolution"[26] by the Secretary yields a definition of the term "pattern," review at this time can only lead the court into error as to the meaning of section 104(e).[27]

The necessity of further policy evolution to define the term "pattern" also implicates agency interests in favor of deferring review of the Secretary's presumption. The

**26.** *Capitol Technical Services, Inc. v. FAA,* 791 F.2d at 969.

**27.** *Cf.* cases cited in note 9, *supra.* The court contends that it "has an interest in considering Consol's challenge now" because "[b]y the time a 'pattern' notice is finally issued, the facts supporting the underlying violations will have grown stale. To attempt at that point to review what might be hundreds of prior findings that individual violations were significant and substantial, many of which might have been made years earlier, would be an impossible task." Maj. op. at 1080 (footnote omitted).

The court here simply piles one unsupportable assertion upon another. First, the court assumes that in a pattern case our review of the Secretary's presumption that *any* respirable dust violation is "significant and substantial" would require us to engage in individualized factual review of *each* prior finding. Given the presumptive nature of the Secretary's enforcement policy, however, such individualized review would not be necessary. In deciding whether *the presumption* violates the Mine Act, the individual facts of each such violation would be irrelevant to our analysis because the Secretary disavows any reliance upon them. We therefore need to address this issue only once, either now or when properly presented in a section 104(e) case, and that one resolution will apply to all the violations that the Secretary claims, in a later case, constitute a pattern. *Cf. American Trucking Ass'n, Inc. v. ICC,* 747 F.2d at 790.

Second, once we upheld the Secretary's enforcement presumption, the only relevant question of fact would be whether respirable dust violations did occur as alleged by the Secretary. Because an operator may immediately contest whether a respirable dust standard has been violated (as Consol chose not to do in this case), all the relevant factual questions will have been litigated when the violation was first charged. If review of a subsequent "pattern" finding ever became necessary, the fact that a violation of a respirable dust standard occurred at a particular place and time will be a matter of official record; the proof will therefore be documentary. (The court attempts to rely on Consol's contention concerning the accuracy of the samples to show that individualized factual review will be necessary. This argument amounts to no more than (1) the testing device is too unreliable to support the Secretary's presumptive reliance on its results, or (2) the device malfunctioned in this case, and thus the dust standard

terms "pattern" and "significant and substantial" are related in section 104(e), and our premature interpretation of the latter term raises the possibility of our constricting the Secretary's proper discretion, *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984),[28] when he turns to interpreting the term "pattern."[29]

was not in fact violated. The former contention depends not on the particulars of any one violation, but on the general accuracy of the device, and the latter contention, as I have stated, may be litigated at the time of the citation. Here, Consol has conceded that the standard was violated.)

**28.** In the instant case, the court does not clearly indicate whether it is reviewing the Secretary's interpretation of the Mine Act, or that of the Federal Mine Safety and Health Review Commission. We have elsewhere held, though, that *Chevron* deference, which is clearly required in this case, is to be accorded the Secretary's interpretation. *See Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 537 (D.C.Cir.1986); *Donovan v. Carolina Stalite Co.,* 734 F.2d 1547, 1552 (D.C.Cir.1984).

**29.** *See Cities of Anaheim & Riverside, Cal. v. FERC,* 692 F.2d 773, 779–80 (D.C.Cir.1982) ("Review by the court now would invade the province of the administrative agency."). *Cf. Southern R. Co. v. Seaboard Allied Milling Co.,* 442 U.S. 444, 460, 99 S.Ct. 2388, 2397, 60 L.Ed.2d 1017 (1979); *Arrow Transportation Co. v. Southern R. Co.,* 372 U.S. 658, 670, 83 S.Ct. 984, 990, 10 L.Ed.2d 52 (1963); *Papago Tribal Utility Authority v. FERC,* 628 F.2d at 239–40 ("[T]he reviewability of an order must therefore be determined by ... whether judicial review at this stage of the administrative process would invade the province reserved to the discretion of the agency.... [A]t this stage we would be acting ... without the benefit of the Commission's views on relevant questions of law and regulatory policy.").

The court therefore errs when it states that "[t]he Commission's policy with respect to the designation of respirable dust violations as significant and substantial has been fully developed in final form and unconditionally applied to Consol, so that our review poses no danger of interrupting the agency's decisionmaking process." Maj. op. at 1080. The term "significant and substantial" cannot be interpreted outside of its statutory context, in this case section 104(e). (This is particularly so given Consol's contention that Congress did not intend to authorize withdrawal orders under sections 104(d) and 104(e) for the violation before us, and that we should therefore conclude that this violation cannot be "significant and substantial.") Until

Considering the institutional interests of this court and the agency in deferring consideration of Consol's contentions, the claims it raises are clearly not "fit" for review.

## IV. HARDSHIP TO CONSOL

Having reviewed Consol's section 104(e) claim to determine its "fitness" for review, the court's analysis then takes an unexpected turn. Instead of proceeding to determine, under the second prong of the *Abbott Laboratories* test, whether Consol suffered "hardship" under section 104(e) as a result of the "significant and substantial" presumption, the court simply concludes that the claim is ripe, omitting entirely any analysis of hardship. It will later show why Consol has suffered no "hardship" from the Secretary's presumption, but first I must address the court's attempt to evade application of the *Abbott Laboratories* test.

### A. The Need to Assess "Hardship"

In explaining its rush to judgment, the court offers the sweeping principle that:

the Secretary defines the critical term in that provision—*viz.,* "pattern"—our review of his interpretation of "significant and substantial" poses a clear "danger of interrupting the agency's decisionmaking process" with regard to interpreting section 104(e).

In arguing that this case is fit for review, the court also contends that:

it appears that postponing review would be detrimental to the agency, leaving it uncertain as to its ability to impose the more serious sanctions available under §§ 104(d) and (e), which depends on initial findings that a violation is significant and substantial.

Maj. op. at 1080 (footnote omitted). The court offers no basis in fact for this assertion; there has been no representation by the Secretary that he has been inhibited, for example, from applying section 104(e), although five years have passed since the time of this citation and any evidence of such an inhibiting effect should have become obvious by now. Nor would one expect that the Secretary would be inhibited since, under *Chevron,* this court must uphold any "permissible construction" of the Mine Act that he chooses to adopt. 467 U.S. at 843, 104 S.Ct. at 2782.

For the same reason, I consider highly suspect the court's argument that ripeness analysis should be influenced by the belief that "postponing review would be detrimental to the agency,

Where, as in this case, there are no institutional interests favoring postponement of review, and in fact the agency and the court have a positive interest in immediate review, "there are no conflicting interests to balance." *Eagle-Picher [v. United States States EPA ]*, 759 F.2d at 918. It is enough that the petitioner show that it has suffered sufficient hardship to pass the Article III threshold. Because we have already determined that Consol has shown sufficient hardship to satisfy the constitutional requirement, it seems obvious that "[w]e need not proceed ... to the second prong of the *Abbott Laboratories* test." *Eagle-Picher,* 759 F.2d at 918; *see also Midwestern Gas Transmission Co. v. FERC,* 589 F.2d 603, 621 (D.C.Cir.1978).[30]

Although this passage suggests that the court is merely stating a principle of black-letter law, it is in fact announcing a novel proposition that is flatly inconsistent with numerous decisions of this court[31] and, more important, with the landmark Supreme Court decisions in *Abbott Laborato-*

leaving it uncertain as to" the meaning of a statute. Under *Chevron,* the agency is the primary interpreter of the statute, and we must uphold any "permissible construction" thereof that it offers. *Id.* The centrality of the agency's interpretive role under *Chevron* only enhances the force with which the ripeness doctrine should be understood to counsel the court against interrupting the evolution of agency policy. *See* cases cited in note 8, *supra.* In this case, the Secretary has not yet interpreted the term "pattern" in section 104(e) and, as I have argued, we cannot properly review the Secretary's interpretation of "significant and substantial" in isolation from the term "pattern." The court therefore turns ripeness analysis on its head when it contends that the undeveloped status of the Secretary's section 104(e) policy is a reason why it should now reach Consol's claim.

30. Maj. op. at 1081–82 (footnotes omitted).

31. *See American Fed'n of Gov't Employees v. FLRA,* 750 F.2d at 144; *American Trucking Ass'n, Inc. v. ICC,* 747 F.2d at 790; *Tennessee Gas Pipeline Co. v. FERC,* 736 F.2d at 749; *Alascom, Inc. v. FCC,* 727 F.2d at 1217; *Air New Zealand Ltd. v. CAB,* 726 F.2d at 838; *Baltimore Gas & Elec. Co. v. ICC,* 672 F.2d at 149.

*ries v. Gardner*[32] and *Toilet Goods v. Gardner*,[33] all of which clearly state that "fitness" alone does not render a claim ripe—the petitioner must also show "hardship," which is more than the "injury" necessary to support standing.[34] The court apparently believes that it derives some support from this court's decisions in *Midwestern Gas* and *Eagle-Picher*, but even if this court could overrule the Supreme Court, these cases would provide little support for doing so here. *Midwestern Gas* did apply the principle invoked by the court, but it failed to address the obvious conflict with the *Abbott Laboratories* and *Toilet Goods* cases. Perhaps as a result, this court has not relied upon *Midwestern Gas* for this proposition, but has instead six times since adopted the contrary rule.[35]

As for *Eagle-Picher*, it stands for far less than the court here supposes. In fact, rather than stating that no "hardship" is necessary to make ripe a claim that is otherwise "fit," as the court today suggests, *Eagle-Picher* frankly acknowledged that "[i]n some of our decisions we have suggested that the court should consider 'the hardship to the parties,' even where the first prong of the *Abbott Laboratories*

test is met."[36] *Eagle-Picher* then recognized a narrow exception to this rule for situations in which "Congress has emphatically declared a preference for immediate review," as it had in the statute there in question by imposing a specified time period after promulgation for judicial review of regulations:

> If we were to defer review in such a case merely because we could find no significant harm to the petitioner from delay, we would achieve the perverse result of postponing review to the detriment of the agency and the court and in contravention of the express preferences of Congress, in the name of a prudential doctrine that is intended to protect the institutional needs of courts and agencies.[37]

When properly read, the exception found in *Eagle-Picher* is completely inapposite to this case, because Congress in the Mine Act has not even faintly let alone "emphatically declared a preference for immediate review."[38]

The court, however, in a feat of alchemy transforms the sensible and narrow excep-

---

**32.** *See* 387 U.S. at 149, 87 S.Ct. at 1515 ("The problem is best seen in a twofold aspect, requiring us to evaluate *both* the fitness of the issues for judicial decision *and* the hardship to the parties of withholding court decision."), 153, 87 S.Ct. at 1518 ("Where the legal issue presented is fit for judicial resolution, *and* where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts ... must be permitted....") (emphases added).

**33.** *See* 387 U.S. at 164, 87 S.Ct. at 1524: "We are also led to this result by considerations of the effect on the petitioners of the regulation, for the test of ripeness, as we have noted, depends not only on how adequately a court can deal with the legal issue presented, but also on the degree and nature of the regulation's present effect on those seeking relief."

**34.** For an Article III "case or controversy" to exist, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The requisite injury here need only be "distinct and palpable." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

The ripeness test of "hardship" imposes the additional requirements that the injury be "immediate and significant" and that subsequent proceedings cannot remedy it. *Supra* at 1091–1092.

**35.** *See* cases cited in note 31, *supra.*

**36.** *Eagle-Picher*, 759 F.2d at 918 & n. 70 (citing three of the cases in note 31, *supra* ).

**37.** *Id.* at 918.

**38.** The court's error results from its misreading the narrow exception in *Eagle-Picher* as arising from Congress' "institutional interest" in immediate review. Instead, *Eagle-Picher* stated only that courts should not, on prudential grounds relating to "hardship," defer review "in contravention of the express preference of Congress." *Eagle-Picher*, 759 F.2d at 918. I agree. *See Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 82, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978). Contrary to the court's suggestion here, *see* maj. op. at 1082 n. 12, *Eagle-Picher* never contended that Congress had any unexpressed "institutional interest" in accelerating review, and I cannot imagine what that interest would be.

tion announced in *Eagle-Picher* into a general rule that *Eagle-Picher* itself conceded had been rejected by this court. Two subsequent opinions of the court, written by the author of *Eagle-Picher*, illustrative vividly how the court here has foresaken the *Abbott Laboratories* requirement that a court evaluate *"both* the fitness of the issues for judicial decision *and* the hardship to the parties of withholding court consideration." [39] This court found the claims in *Better Government Ass'n v. Department of State* [40] and *Capitol Technical Services, Inc. v. FAA* [41] prudentially ripe only after determining not only that they were "fit for review," but also that the petitioners would suffer "hardship" in the absence of review. It is clear in each case, moreover, that the "hardship" relied upon by the court was in addition to that necessary for a "case or controversy." [42] If *Eagle-Picher* did indeed stand for the proposition that the court here suggests, then this "hardship" analysis was totally beside the point; no further inquiry would have been called for once the "fitness" determination was made.

The court's evasion of the "hardship" requirement in this case is therefore a sport, without basis in this circuit's law. If the court had properly proceeded to address "hardship," furthermore, it is clear that Consol's claim could not have been found to be ripe. As I will show, the two injuries that the court points to in finding that Consol has standing do not satisfy the "hardship" test.

### B. *The Amount of the Fine*

The court asserts that the "significant and substantial" designation "increased the amount of the civil penalty assessed against Consol for this violation" from $20 to $150. [43] According to the court, the designation thus resulted in $130 worth of injury, which makes this case ripe for review. If the matter were so simple, of course, we would not be in disagreement. Upon inspection, however, the claimed harm proves illusory.

The Mine Act authorizes the Secretary to propose a civil fine of up to $10,000 for a violation of a mandatory health or safety standard. [44] An operator may pay the proposed fine or contest it before the Commission. If the Commission agrees that the operator has violated the Act, it assesses the amount of the fine *de novo.* The Commission's discretion, within the statutory maximum, is limited under the Mine Act only by the list of factors to which Congress directed its consideration. [45] Whether a violation is "significant and substantial" is not even one such factor, let alone determinative, of the amount of a fine below $10,000. Rather, that amount depends upon a variety of factors, of which the only one even arguably relevant here is "the

39. 387 U.S. at 149, 87 S.Ct. at 1515 (emphasis added).

40. 780 F.2d 86 (1986).

41. 791 F.2d 964 (1986).

42. In fact, before the court began its ripeness analysis in *Better Government Ass'n,* it had assumed that Article III's "case or controversy" requirement was satisfied. *See* 780 F.2d at 92 n. 25. I therefore fail to understand how the court here can deny that ripeness in its prudential form represents a "super-standing" requirement. Maj. op. at 1082. If ripeness does not require *more than is required merely for constitutional* standing, as the court contends in effect, then the doctrine has no content.

43. Maj. op. at 1078.

44. *See* section 110(a) of the Mine Act, 30 U.S.C. § 820(a).

45. *See* section 110(i) of the Mine Act:
The Commission shall have authority to assess all civil penalties provided in this chapter. In assessing civil monetary penalties, the Commission shall consider the operator's history of previous violations, the appropriateness of such penalty to the size of the business of the operator charged, whether the operator was negligent, the effect on the operator's ability to continue in business, the gravity of the violation, and the demonstrated good faith of the person charged in attempting to achieve rapid compliance after notification of a violation. In proposing civil penalties under this chapter, the Secretary may rely upon a summary review of the information available to him and shall not be required to make findings of fact concerning the above factors.
30 U.S.C. § 820(i).

gravity of the violation." As will be seen, however, this factor is not the same as whether a violation is "significant and substantial," a designation that either is or is not applied by the Secretary and has consequences not for the amount of a fine but only for any latter "pattern" citation. In fact, in this case, the Secretary had recommended a fine of $140, but the Commission, for its own, unexplained reasons, decided that Consol's violation warranted a fine of $150. Thus, from the language of the Mine Act and the facts of this case there is simply no reason to believe that the Commission would have imposed a fine less than $150 if the MSHA inspector had not memorialized the Secretary's enforcement presumption by making the "significant and substantial" notation.

The Secretary has developed general guidelines, binding on the Commission, for determining the appropriate civil fine to propose in various circumstances. *See* 30 C.F.R. Part 100 (1986). Nowhere in these regulations, though, does the "significant and substantial" finding appear as a factor. Section 110.4 (30 CFR) does provide for a $20 fine "where the violation is not reasonably likely to result in a reasonably serious injury or illness, and is abated within the time set by the inspector." As the court notes, the first part of this standard is the same as the Secretary's criterion for identifying a "significant and substantial" violation. The court therefore concludes that if the "significant and substantial" designation in the citation was improper under the Mine Act, then under the regulations Consol was entitled to receive a mere $20 fine. In support of this contention, the court appears to rely exclusively on the following statement in the Secretary's brief: "the Secretary has ... determined that violations that are serious enough to be designated significant and substantial are serious enough not to be eligible for MSHA's $20 minimum penalty." [46]

The court's reliance is misplaced and its logic flawed, however. First, as to logic: the fact that the standard in section 110.4 (CFR), which determines eligibility for a $20 fine, and the standard in sections 104(d) and 104(e) of the Mine Act,[47] which determine whether a violation is "significant and substantial," are *idem sonans* does not support the conclusion that we must determine whether Congress in those statutory sections authorized the Secretary to treat the respirable dust violation of section 104(a) here as "significant and substantial." In the Mine Act, Congress defined certain violations to be "significant and substantial"; let us designate this standard "A." In exercising his broad discretion to propose fines up to an amount of $10,000, the Secretary in his regulations announced the proposition, in substance, that some violations are so serious that they should not receive a mere $20 fine; designate this standard "C." The Secretary then gave meaning both to "A" and to "C" by defining them similarly as those violations that are "reasonably likely to result in a reasonably serious injury or illness"; designate this standard "B."

According to the court, since A = B and B = C, then A = C, with the effect that under the regulations a violation should receive a $20 fine unless that violation was "significant and substantial" under the Mine Act. The difficulty with reaching this result is that A = C equates a congressional standard *for withdrawal orders* (standard A) with the Secretary's standard *for fines* (standard C), on the basis of a bridging definition (standard B) provided by the Secretary. Whether a court's holding that

---

46. *See* maj. op. at 1078–79, quoting Brief of the Secretary of Labor at 32 n. 16. The court goes on to state that "MSHA *apparently* routinely applies the $20 penalty to violations that are not designated as significant and substantial," *id.* at 1079 (emphases added), but the court provides no real support for this finding in the record before us. Instead, the court relies on a statement by Consol's counsel at oral argument. *Id.* Why Consol should be authoritative or even knowledgeable about the Secretary's enforcement practices is not altogether obvious, particularly given Consol's claim to have a record of exemplary compliance with the respirable dust standards. *See* Brief of Consolidation Coal Company at 33 n. 10; *infra* note 60. In any event, the Secretary made no such representation, even at oral argument.

47. 30 U.S.C. §§ 814(d), 814(e).

the Secretary incorrectly designated a violation as "significant and substantial" would imply that no more than a $20 fine was therefore indicated for that violation depends upon the Secretary's purpose in expressing the standard for a $20 fine in terms of whether a violation is "reasonably likely to result in a reasonably serious injury or illness." If the Secretary intended "reasonably likely to result in a reasonably serious injury or illness" to be a proxy for "significant and substantial," with the implication that he meant to limit his discretion in setting fines to how courts later interpreted "significant and substantial," then the court's conclusion that Consol was harmed in the amount of $130 is warranted. If instead, the Secretary intended to apply the "reasonably likely to result in a reasonably serious injury or illness" standard independently in two different contexts, where they have different consequences, without intending to equate the standards or to link the two issues at which they relate, then we could not properly conclude that whether a violation should receive a $20 fine depends on whether it is "significant and substantial" under the Mine Act.[48] Rather, we would have to determine whether that violation was "reasonably likely to result in a reasonably serious injury or illness" as the Secretary intended that phrase in the $20 fine regulation, and this is not an argument presented by Consol.[49]

Second, therefore, we must address the question of the Secretary's intent, as to which the court relies on the following statement in the Secretary's brief: "the Secretary has ... determined that violations that are serious enough to be designated significant and substantial are serious enough not to be eligible for MSHA's

**48.** The court infers from a representation at oral argument (*see* maj. op. at 1079) that there is a 1:1 correlation between "significant and substantial" designations and fines of more than $20. From this, the court concludes that a ruling that the Secretary's enforcement presumption for "significant and substantial" is invalid under the Mine Act would in turn compel the conclusion that the proper fine for this violation was $20.

In so arguing, the court confuses correlation with causality, just as does the person who, noticing that fires are more severe when more firemen are present, deduces that the way to diminish fire damage is to have fewer firemen. In our case, instead of there being a causal relationship between "significant and substantial" designations and fines of more than $20, any 1:1 correlation (assuming that it does exist) appears to result from the Secretary's determining first whether a violation is "reasonably likely" *etc.*, and from a positive answer reaching two separate conclusions: (1) to assess more than a $20 fine for that violation and, (2) if a "pattern" of similar violations develops, to treat such violations as "significant and substantial" for the purpose of deciding when a withdrawal order is necessary under section 104(e) of the Mine Act.

If this accurately explains the correlation (and I conclude that it does, *see* text *infra*), this appeal is not ripe for review, because the complained-of harm (*viz.* the fine above $20) will not be redressed by this court ruling that the Secretary violates the Mine Act when he presumes that all respirable dust violations are "significant and substantial." Simply put, such a ruling would have no bearing on the Secretary's separate conclusion that violations that are "reasonable likely" *etc.* should be fined more than $20. Consequently, in Consol's case, the *only* relief that would follow from such a ruling would be that this non—"significant and substantial" violation could not later form part of a "pattern" of such violations under section 104(e). The $150 fine, however, would be unaffected. Because the relief sought by Consol will not redress the fine, Consol may not rely upon that fine to show that the propriety of the Secretary's enforcement presumption is an issue now ripe for review, nor even, as the court would, that Consol has standing to object to the presumption. *See Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).

**49.** The $150 fine would clearly have rendered ripe for review the propriety of the "significant and substantial" finding if Consol had argued that this violation was not "significant and substantial" on the ground that the Secretary in this instance misapplied his "reasonably likely to result in a reasonably serious injury or illness" standard for what constitutes a "significant and substantial" violation (i.e., that the Secretary's determination that this violation was "reasonably likely" *etc.* was unsupported by the facts). Since the Secretary's regulations state that a $20 fine is appropriate except when a violation is "reasonably likely" *etc.*, a judicial determination that the violation was not "reasonably likely" *etc.* would therefore result not only in the voiding of the "significant and substantial" finding, but also in reducing the fine to $20. In the actual case before us, however, Consol does *not* contend that the Secretary misapplied his own "reasonably likely" standard to the facts.

$20 minimum penalty." When that passage is read in its immediate context, however, it dictates the contrary conclusion from that reached by the court, *viz.*, that the Secretary has merely applied the same standard independently in two different contexts, with no linkage intended:

> *The "significant and substantial" designation ... does not, per se, have any effect on the size of the penalty that MSHA proposes for a violation.* One of the factors MSHA must consider in proposing a penalty is the "gravity," or seriousness of the violation. MSHA designates as significant and substantial those violations which rise to a certain level of seriousness, and the Secretary has also determined that violations that are serious enough to be designated significant and substantial are serious enough not to be eligible for MSHA's $20 minimum penalty. *The two policies are distinct, however. Even if it were to be judicially determined that the statutory significant and substantial finding requires a higher degree of gravity than that currently utilized, that finding would not necessarily have any effect on MSHA's gravity evaluation for civil penalty purposes.*[50]

50. Brief of the Secretary of Labor at 32 n. 16 (emphases added).

51. This conclusion as to the Secretary's intent is buttressed by the fact that, if the Secretary had wanted to bind himself and the Commission in such a way, he could have easily done so by providing in the regulations that fines above $20 shall be assessed for "significant and substantial" violations, omitting altogether the "reasonably likely to result in a reasonably serious injury or illness" standard.

52. The court's reliance on the effect this violation will purportedly have on Consol's recorded compliance history, *see* maj. op. at 1079, is also unfounded, since recordation of the violation was simply a corollary of having to pay a fine of above $20.

53. The court has not argued, let alone shown, that in the absence of the "significant and substantial" finding Consol's fine, even if greater than $20, would still have been less than $150. Under the regulations, if the violation does not qualify for the $20 fine, the Secretary generally calculates the amount of the fine using an elaborate formula for quantifying the seriousness of

In other words, whether Congress in enacting sections 104(d) and 104(e) of the Mine Act intended for a violation in the nature of Consol's to result in a withdrawal order (i.e., whether this violation may be presumed to be "significant and substantial" —the issue that the parties wish to litigate and the court obligingly decides) does not determine whether Consol was entitled to be fined only $20. Congress in the Mine Act granted to the Secretary (and thus to the Commission which applies his regulations) virtually unreviewable discretion in proposing fines up to $10,000, and the Secretary has not bound himself or the Commission in any way to a policy that would follow the court's interpretation of "significant and substantial" in determining whether a $20 fine is appropriate under 30 C.F.R. § 100.4.[51]

Therefore, any interpretation by this court of what Congress meant by "significant and substantial" in sections 104(d) and 104(e) will have utterly no effect on either the Secretary's method of assessing fines or, more importantly, on Consol's fine for the violation.[52] Consol therefore cannot rely on the $150 fine to make the necessary ripeness showing that it suffered concrete "hardship" as a result of the "significant and substantial" designation and the Secretary's enforcement presumption.[53]

the violation in terms of the sub-section 110(i) factors. *See* 30 C.F.R. § 100.3. The "gravity" of the violation involves

> an evaluation of the seriousness of the violation as measured by the likelihood of the occurrence of the event against which a standard is directed, the severity of the illness or injury if the event occurred or were to occur, and the number of persons potentially affected if the event occurred or were to occur.

*Id.* § 100.3(e). The regulation establishes "likelihood" and "severity" point values, none of which involves whether the violation is "significant and substantial" or even whether the violation is "reasonably likely to result in a reasonably serious injury or illness."

In certain exceptional situations, the Secretary assesses fines under an alternative provision. Under 30 C.F.R. § 100.5, the Secretary may impose a "special assessment" for "some types of violations [that] may be of such a nature or seriousness that it is not possible to determine an appropriate penalty under" subsection 100.4 or subsection 100.3. None of the eight listed categories qualifying for a "special assessment," however, involves a determination of whether a violation is either "significant and

## C. The "Pattern" Issue

It is also clear, and the court does not argue otherwise, that Consol suffered no "hardship" under section 104(e) as a result of the Secretary's presumption that the respirable dust violation for which it was cited was "significant and substantial."[54] It is of course undisputed that Consol suffered no immediate penalty under section 104(e).[55] Nor did the presumption confront Consol with a "hard choice between compliance certain to be disadvantageous and a high probability of strong sanctions."[56] The presumption itself posed no "hard choice" because (1) the violation, which Consol concedes occurred, was already unlawful and punishable by a fine under sections 104(a) and 110(a) of the Mine Act, without regard to the presumption; and (2) when an operator violates a respirable dust standard, sections 104(b), 104(f), and 110(b)[57] of the Mine Act automatically confront it with the choice between either abating the violation or suffering a withdrawal order and increased fines. The "significant and substantial" presumption, therefore, merely enables the Secretary to use the withdrawal remedy under section 104(e) in those situations where the fine and withdrawal order penalties under sections 104(a), 104(b), 104(f), 110(a), and 110(b) have failed to prod the operator into

substantial" *or* "reasonably likely to result in a reasonably serious injury or illness."

**54.** Because, as I have shown, *supra* note 34, the injury required for standing is less than that needed for "hardship," the court's reliance on *Straus Communications, Inc. v. FCC,* 530 F.2d 1001, 1006 (D.C.Cir.1976), which involves standing, is inapposite for ripeness analysis. *See* maj. op. at 1078, 1079.

**55.** The court states that the "typical case" of an unripe claim "involve[s] pre-enforcement challenges to agency action," and then distinguishes "[t]his case [which] does not involve a pre-enforcement challenge." Maj. op. at 1081 & n. 10. The court does not appear to rely on this distinction in any way, however. Although *Eagle-Picher v. United States EPA* also assumes that the *Abbott Laboratories* ripeness test is limited to "pre-enforcement" challenges, 759 F.2d at 915–16, it is abundantly clear that, pre-enforcement or not, *Abbott Laboratories* replaced the "tangle of special rules and legalistic distinctions" that had previously governed ripeness determinations with a "practical common sense" test (of "fitness" and "hardship") applicable to all agency actions. *Continental Air Lines, Inc. v. CAB,* 522 F.2d at 124 (footnote omitted). *See State Farm Mut. Auto Ins. Co. v. Dole,* 802 F.2d at 479; *Air New Zealand Ltd. v. CAB,* 726 F.2d at 836–37.

Even though the "pre-enforcement" distinction does not play any part in the court's analysis, I note that the contention that Consol's appeal "does not involve a pre-enforcement challenge" is simply wrong, and results from the court's failure to distinguish between enforcement under section 104(a) (issuance of citation) and under section 104(e) (issuance of "pattern" finding and subsequent withdrawal order). In this case, there was enforcement under section 104(a) when the Secretary issued a citation to Consol for violation of a respirable dust standard. Consol could seek immediate review of that citation on the ground that the violation did not occur, but that section 104(a) enforcement

is irrelevant with respect to Consol's challenge to the "significant and substantial" designation placed on the citation by the MSHA inspector.

For the court's distinction to be of any moment there would have to be enforcement under section 104(e). The designation, however, does not constitute "enforcement." As I have shown, the *designation* did not cause the fine to be increased, and the *violation* has not yet formed part of a "pattern" under section 104(e). Furthermore, as I have stated above, *supra* at 1089, the designation was a foregone conclusion given the Secretary's presumption that *any* respirable dust violation is "significant and substantial." Consequently, if the Secretary's presumption were "squarely applied to Consol" as the court believes, maj. op. at 1077, then it would have "squarely applied" regardless of whether the inspector omitted the notation, because whether a violation may later form part of a "pattern" under section 104(e) does not depend upon whether the citation states that the violation is "significant and substantial." The Secretary's presumption was therefore "applied" in this case to the same extent as were the unripe preliminary determinations in the cases cited *infra* note 64, which the court vainly attempts to distinguish. *See* maj. op. at 1082 n. 13.

As a matter of common sense, Consol's appeal involves not the specific violation before us, but merely the Secretary's presumptive interpretation of the statutory phrase "significant and substantial." To review the presumption at this stage, when no "pattern" finding has been made, is no different than reviewing it immediately upon its initial announcement by the Secretary. Since this would be comparable to the situation in the *Abbott Laboratories* trilogy, where petitioners sought review of regulations prior to their enforcement, Consol's appeal is as much "pre-enforcement" as were those appeals.

**56.** *Tennessee Gas Pipeline Co. v. FERC,* 736 F.2d at 751.

**57.** 30 U.S.C. §§ 814(b), 814(f), 820(b).

compliance, and that is far from this case.[58] We consequently do not address a situation in which the disputed agency action (here the "significant and substantial" presumption) affected Consol's "primary conduct"[59] either by deterring it from engaging in profitable activity *or* by compelling it to undertake costly compliance measures.[60]

Furthermore, even though a single "significant and substantial" violation is "an important first step in a chain of events" leading to enforcement under section 104(e), any number of contingencies "may interrupt the chain."[61] Consol will be harmed as a result of the Secretary's presumption that this violation was "significant and substantial" *if and only if* (1) Consol commits further "significant and substantial" violations for which it is cited, (2) the Secretary then makes a finding that the series of violations constitutes a "pattern" within the meaning of section 104(e), and (3) after being notified that a "pattern" exists, Consol commits still another "significant and substantial" violation. Only after all these events transpire will the Secretary order withdrawal. The likelihood that the particular violation in this case, which occurred over five years ago, will ever form part of a "pattern" finding is therefore virtually nil, and would certainly be far too hypothetical to justify judicial review even if the issue were not otherwise unfit for such review.[62]

Finally, whatever hypothetical harm may come to pass can be fully averted by review *when* and *if* the Secretary issues a "pattern" notice or a withdrawal order.[63] In this respect, the instant case differs not at all from previous decisions by this court in which we have postponed to a more appropriate time review of concededly "final agency action" that imposed no present hardship.[64] Given the availability of adequate relief at a later time, when the issue is presented in the context of an actual "pattern" finding to which the Secretary has applied a stated policy for implementing section 104(e), this issue is clearly not ripe for review now.[65]

## V. Conclusion

This rationale offered by this court (per Scalia, J.) for dismissing another recent case as unripe applies equally well, indeed perfectly, to the instant case. I cannot improve upon it, so I will simply restate it:

> [The ripeness doctrine] protect[s] us from adjudicating matters that are not sufficiently "fleshed out" that we may see the concrete effects and implications of what we do ... [and it] protect[s] us from adjudicating matters that in fact

58. The Secretary's presumption therefore has a very different effect upon operators than had the labeling requirements imposed upon the petitioners in *Abbott Laboratories.* The labeling rulemaking established new norms of conduct, thereby subjecting previously lawful behavior to sanctions. In contrast, the Secretary's presumption here established no new norm of conduct, but would in a later case merely permit the Secretary to enforce preexisting norms by means of the section 104(e) withdrawal penalty, in addition to the withdrawal and fine penalties available elsewhere in the Mine Act.

59. *Toilet Goods v. Gardner,* 387 U.S. at 164, 87 S.Ct. at 1524.

60. In fact, Consol argues that the violation was not "significant and substantial" because it was a one-time violation, Consol having scrupulously complied with this mandatory standard both before and after the one violation. Brief of Consolidation Coal Company at 33 n. 10. The citation and the "significant and substantial" presumption did not prompt Consol to alter its behavior in any manner other than to "babysit"

the sampling device (in order to abate the violation) and to bring this litigation. *See* maj. op. at 1075.

61. *Midwestern Gas Transmission Co. v. FERC,* 589 F.2d at 623.

62. *Cf.* cases cited in note 13, *supra.*

63. The court does not resolve today the question of whether the "pattern" notice would be a reviewable final order or an operator must wait for judicial review until such later time as the Secretary actually orders withdrawal.

64. *See e.g., Northern Natural Gas Co. v. FERC,* 780 F.2d 59, 63, *reh. granted and opinion vacated in other part,* 780 F.2d 64 (D.C.Cir.1985); *Air New Zealand Ltd. v. CAB,* 726 F.2d at 838; *Midwestern Gas Transmission Co. v. FERC,* 589 F.2d at 622–25.

65. *Cf. Tennessee Gas Pipeline Co. v. FERC,* 736 F.2d at 749–51; *Baltimore Gas & Elec. Co. v. ICC,* 672 F.2d at 149.

make no difference and are a waste of our resources.... [T]he prematurity [in this case] is such that—whether or not constitutional limits are exceeded, and whether or not the agency objects—our own ability to decide intelligently, and our own confidence that we are expending resources in resolving a dispute that has substance, are proximately affected.... In these circumstances, we would be foolhardy to proceed, even absent objection, in a case that does not meet the *Abbott Laboratories standard.*[66]

The issue in the case before us is not "fit for review" and Consol has suffered no "hardship." Because "[n]o roving preview function has been assigned to courts in the federal system," [67] this petition should have been dismissed. I therefore dissent.

---

**66.** *American Trucking Ass'n, Inc. v. ICC,* 747 F.2d at 789–90.

**67.** *Tennessee Gas Pipeline Co. v. FERC,* 736 F.2d at 751.